**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------x

KAITLYN RAMIREZ,

      Plaintiff,                              **COMPLAINT**

      -against-

                                             Case No. 1:20-cv-06258

TEMIN & COMPANY, INC.,
and DAVIA TEMIN,

      Defendants.                        Jury Trial Demanded

------------------------------------------------------------------x

Plaintiff Kaitlyn Ramirez, by and through undersigned counsel, states the following for her Complaint against Defendants Temin & Company, Inc., and Davia Temin, on personal knowledge as to her own acts and observations, and on information and belief as to all other matters.

### THE PARTIES

1.    Plaintiff Kaitlyn Ramirez ("Plaintiff" or "Ramirez") is an individual residing in Hamilton Township, New Jersey. Ramirez is a citizen of New Jersey.

2.    Defendant Temin & Company, Inc. ("Temin & Co."), is a New York corporation with a principal place of business in New York. Temin & Co. is a citizen of New York.

3.    Defendant Davia Temin is an individual residing in New York, New York. Temin is a citizen of New York.

4.    Plaintiff Ramirez was employed by Defendants. She was an employee, and Defendants were employers, within the meaning of the New York City Human Rights Law,

1

N.Y.C. Admin Code § 8-107 et seq., and also within the coverage of 42 U.S.C. § 1981, the New York State Human Rights Law, N.Y. Exec. Law § 290 et seq., and the New York Labor Law.

5.     Defendant Temin engaged in direct adverse acts against Ramirez, including harassment and failure to pay proper wages, as well as constructive discharge from employment. She aided, abetted, incited, compelled, and commanded the actions of Temin & Co., and acted as Temin & Co.'s agent.  She is subject to suit under the New York City and State Human Rights Laws and 42 U.S.C. § 1981, as well as the New York Labor Law.

6.     Defendants acted in one another's interest with respect to Plaintiff, and as one another's agents, such that the acts of one may be imputed to all Defendants.  Unless otherwise specified, the allegations here relate to all Defendants.

<u>**JURISDICTION AND VENUE**</u>

7.     This Court has original subject matter jurisdiction over this action under 28 U.S.C. §§ 1331, 1332 and 1343.  There is complete diversity of citizenship between the Plaintiff (who is a New Jersey citizen) and Defendants (who are New York citizens), and the amount in controversy, excluding interests in costs, exceeds $75,000.  In addition, this action raises claims under a federal civil rights statute, 42 U.S.C. § 1981, and the city and state law claims are so related to Plaintiff's federal claims that they form part of the same case or controversy under Article III of the United States Constitution.  *See* 28 U.S.C. § 1367.

8.     This Court has personal jurisdiction over the Defendants as the acts and events giving rise to this case occurred in New York.

9.     Venue is proper in the Southern District of New York as the acts and events giving rise to this case occurred in the Southern District of New York.

## FACTS

### Kaitlyn Ramirez's Background

10.     Plaintiff Kaitlyn Ramirez was born and raised in Coop City in the Bronx.

11.     Ramirez is Afro-Latina and of Dominican heritage; she has brown skin, tightly curled black hair, and brown eyes.

12.     Ramirez's grandparents immigrated to the United States from the Dominican Republic.  Ramirez's father is a police officer, and her mother works at a hospital doing clinical documentation.  Ramirez also has a younger sister.

13.     Ramirez spent her childhood and adolescence in New York City - she earned a scholarship to and attended Elisabeth Irwin High School, a progressive independent high school in Manhattan.

14.     When it came time to decide where to attend college, Ramirez's academic excellence resulted in several options.

15.     Ramirez chose to attend Swarthmore College, on the outskirts of Philadelphia, because of its well-known and rigorous academic program.

16.     Ramirez attended Swarthmore College from August 2013 to May 2017.  She graduated with a major in Psychology with a concentration in Behavioral Economics.

17.     During her summer breaks, Ramirez worked jobs and internships, focusing on serving students like herself, advancing science, and advancing public health:

   a.   In the summer of 2014, Ramirez worked as a Summer Immersion Program Counselor at The Oliver Scholars Program, helping teach students physics lessons and preparing them for high school.

b. In the summer of 2015, Ramirez worked as a Research Assistant at Mount Sinai hospital, surveying schizophrenia patients on medication side effects and shadowing psychiatrists on the floor.

c. In the summer of 2016, Ramirez worked as "Shop Healthy NYC Intern" for the New York City Department of Health and Mental Hygiene. She used her knowledge of psychology and behavioral economics to provide technical assistance and incentives to delis and supermarkets in East New York in order to increase the promotion and sales of healthy food products.

18. At the start of her senior year in the fall of 2016, Ramirez applied for Swarthmore College's externship program.

19. The externship program allows current students to connect with Swarthmore alumni by shadowing them at their workplace for one week during winter break.

20. Swarthmore alumni sign up for the program to host current-student externs. These opportunities are compiled into a database, which lists their locations and short descriptions of each experience. The database does not show the names of alumni nor the names of the companies they work for.

21. Then students rank their top four preferred externships.

22. Students are matched with externships through a lottery-based system.

23. This program allows students to explore careers while also networking with Swarthmore alumnae/i.

24.     In 2015, through Swarthmore College's externship program, Ramirez shadowed the Honorable L. Felipe Restrepo, United States District Judge for the Eastern District of Pennsylvania.

25.     In 2016, Ramirez matched with Defendant Davia Temin's externship at Defendant Temin & Company, Inc., a crisis management firm.

26.     Ramirez was excited. At the time, television shows, like "Scandal," made crisis management seem attractive, interesting, and relevant.

### Who is Davia Temin?

27.     Defendant Davia Temin ("Temin"), a White woman, was born in Cleveland, Ohio.

28.     Temin attended Swarthmore College and graduated in 1974. Then she attended Columbia University to pursue a Ph.D. in art history and an M.A. in counseling psychology. She worked in finance at some point.

29.     Temin serves on the Board of Managers at Swarthmore College. Her first term on the Board was from 1996 to 2000. She returned to the board in 2013 and has continued to serve as a Member since then. The Board of Managers is Swarthmore College's governing body.

30.     Temin also serves on about thirteen other corporate boards, including the Girl Scouts, ProPublica, Women Corporate Directors, two artificial intelligence companies, and various entities associated with Columbia and Harvard Universities.

31.     In 1997, Temin founded Temin & Company, Inc. ("Temin & Co."). She is the President and Chief Executive Officer of Temin & Company, Inc.

32.     Temin & Co. has "a practice focused on international crisis, reputation, and risk management, with a specialty in cybersecurity, sexual harassment, and securities-related crisis management."[1]

33.     Temin & Co. also "works with clients to create brand-distinguishing thought leadership and best practices in governance and corporate leadership, as well as to promote women's leadership, and provide socially responsible marketing, media and social media strategy and execution."[2]

34.     Throughout her career, Temin has touted herself as an advocate for progressive values and causes, building her image as a feminist proponent of women's rights:

    a.  For nine years, Temin served as the first vice chair of the Board of Trustees of the Girl Scouts of the United States of America and chair of fund development.

    b.  Temin is a member of Columbia University's Women Creating Change Leadership Council.

    c.  In 2015, Temin was awarded with the Girl Scouts' highest adult honor, the Pinnacle Award for Leadership.

    d.  Temin was named by the Girl Scouts of Greater New York as a Woman of Distinction and served as their Gold Award Ceremony keynote speaker.

    e.  In 2017, Temin was honored by the National Organization for Women-NY, accepting their Woman of Power & Influence Award for her "extensive achievement advancing women's leadership in business, government, and

---

[1] http://www.teminandcompany.com/team/davia-temin
[2] *Id.*

society through a broad array of professional and nonprofit work both in the U.S. and around the world."[3]

    f.    Temin was named a "2018 Enterprising Woman of the Year" by Enterprising Women magazine.

    g.    Temin received the Lifetime Achievement Award from Trust Across America-Trust Around the World, and for five consecutive years was named a "Top Thought Leader in Trust."

    h.    Temin has also been honored as one of the "30 Outstanding Women" in the world by the National Council for Research on Women.

    i.    Temin writes the "Reputation Matters" column on Forbes.com, and is a contributor to various publications, including Huffington Post, American Banker, Directors & Boards, Corporate Board Member, and Chief Executive Magazine.

    j.    Temin has written chapters on crisis leadership for *Women on Board – Insider Secrets to Getting on a Board and Succeeding as a Director*.

    k.    Temin and Temin & Co. received media attention and praise for the creation of a "#MeToo Index", which is a database of all those accused of sexual harassment or associated complaints, dating from the first Bill Cosby trial.

35.    Temin continues to engage with the Swarthmore College community and its students through her Board service, speaking engagements, and other avenues.

---

[3] *Id.*

36.     Swarthmore College holds Temin and her company out to students and alumni as an example and a mentor.

37.     For example, in 2019, Temin gave a "SwatTalk," a presentation to Swarthmore College faculty, students, and the larger Swarthmore community, including alumni, titled "Crisis Management 101." Swarthmore College features the talk on its website.

38.     Temin has participated in Swarthmore College's externship program almost every year since its inception.

**Will the Real Davia Temin Please Stand Up?**

39.     On January 9, 2017, Ramirez started her externship at Temin & Co.

40.     During that week, Temin acted kind and professional, emphasizing her company's glamorous work.

41.     Ramirez worked on a project on dealing with cyberstalking without involving law enforcement. Temin made Ramirez feel like she was doing important work.

42.     On January 13, 2017, the last day of the externship, Temin told Ramirez that she would love for her to come back and work at Temin & Co. after she graduated.

43.     Thrilled, Ramirez followed up with Temin by email about the job offer.

44.     Ramirez graduated from Swarthmore College on May 21, 2017.

45.     On June 5, 2017, Ramirez began a ten-week internship at Temin & Co. Temin told Ramirez that she would start her off as an intern and promote her to full-time employment once the internship ended.

46.     Defendants paid Ramirez a $5,000 stipend through a 1099 for the ten-week internship.

47.     Originally, Temin had offered Ramirez an eight-week internship that paid a $5,000 stipend.   Later in their correspondence, Temin and Ramirez discussed Ramirez participating in a ten-week internship instead.

48.     Ramirez agreed to the ten-week internship, thinking that Temin would provide her with a larger stipend for the extra two weeks.

49.     But Temin claimed there was a misunderstanding and that the internship was ten weeks with the same $5,000 stipend.   Temin did not pay Ramirez more for the extra two weeks she worked.

50.     Temin also refused to pay Ramirez for any time off taken.   In Ramirez's offer letter, Temin wrote: "Should time off be taken/requested during this period, exclusive of any office holidays, it will be deducted from this amount." (Offer Letter)[4]

51.     In Ramirez's offer letter, Temin also wrote: "Temin and Company's office hours begin at 8:30 a.m. and you will need to be at your desk, ready to begin your day's work at that time.   The business day concludes when all pressing matters have been attended to, no earlier than 5:30 p.m.   And as needed, **you may need to work on weekends and significantly after hours**." (Offer Letter; emphasis added.)

52.     As detailed in the offer letter, Ramirez worked in excess of forty hours per week. Typically, she worked fifty to sixty hours each week.   Some weeks, she worked approximately eighty hours.

53.     Despite the number of hours Ramirez worked, Defendants did not pay her any compensation beyond the $5,000 stipend.

---

[4] Ramirez's offer letter has been attached to this Complaint as Exhibit 1.

54.     Though Defendants may have labeled this job as an "internship" in order to dissuade Ramirez and employees like her from thinking they were entitled to proper wages, this job was not an academic observation exercise.  It was in all ways compensable work.  Ramirez performed work to the use and benefit of Defendants; Defendants accepted and retained the benefit of this work, and were aware that Ramirez was performing this work.

55.     At the very beginning of Ramirez's time at Temin & Co., Temin told Ramirez that Ramirez had no experience (Ramirez did have previous experience), knew nothing, and should keep her head down.  Temin ordered Ramirez to "tone it down" when Ramirez described herself as a vocal person.

56.     On August 11, 2017, the last day of her ten-week internship, Ramirez met with Temin to discuss next steps. Based on Temin's prior statements and promises, Ramirez came to the meeting expecting a promotion to permanent employment.

57.     But Temin said, "I want to see you go above and beyond before I promote you to the next level."

58.     Temin informed Ramirez that she was "extending" her "internship" by another thirteen weeks at the same rate of pay, meaning Defendants would pay Ramirez a $6,500 stipend for the thirteen weeks. The upshot was that for another thirteen weeks, Ramirez would not be paid overtime and at points would not even be paid minimum wage.

59.     Ramirez's "internship" was now going to end on November 11, 2017.

60.     Temin's decision disappointed Ramirez.  Ramirez had already been working late and had devoted most of her time to the job.  In reliance on Temin's comments forecasting a

permanent position, Ramirez had not sought any other job opportunities; if she had turned down Temin's "offer," she would have been unemployed.

61.     Lacking any real option, Ramirez continued her extended "internship."

62.     On November 11, 2017, Ramirez's "internship" technically ended, but Temin did not meet with her to discuss any next steps or promotions.

63.     The following Monday, November 14, 2017, Ramirez reported to the office despite her "internship" being over because Temin had not communicated her expectations, and Ramirez took her job seriously and wanted to ensure that she remained available if needed. She met with Temin and discussed being promoted to a permanent position.

64.     Temin agreed to give Ramirez a permanent position as a "Research Assistant." Temin told Ramirez she would be paid a salary of $30,000 per year.

65.     Defendants never issued Ramirez an updated employment contract.

66.     Rachel Clarke, the Chief Operating Officer ("COO") at Temin & Co., added Ramirez to the company payroll on November 16, 2017.

67.     Temin explicitly instructed her employees not to discuss their wages/salaries with each other.

68.     Defendants issued Ramirez the company's "Turnkey Document," which Temin used as her official employee handbook.[5]

69.     The Turnkey Document contains extensive company and personal information, including lists of client names, phone numbers, and addresses. Unlike a traditional employment

_____

[5] The Turnkey Document has been attached as Exhibit 2 to this Complaint. Personal and client health, financial, and security-related information (such as passwords) have been redacted.

handbook, it contains no discussion of employees' rights if they are discriminated against, harassed, assaulted, or not paid proper wages.

70. The Turnkey Document provides information to Temin's staff to manage Temin's personal life. For example, the document contains instructions on how to schedule Temin's hair appointments and pay her personal bills. Temin also expected employees to schedule medical appointments for her at times.

71. On January 5, 2018, Temin told Ramirez that there was a new law mandating that salaried employees make at least $50,000 per year.[6]

72. Temin claimed that she could not afford to pay Ramirez that amount, and said she would make Ramirez an hourly employee instead.

73. Temin said the company would calculate an hourly rate that, *if paid at forty hours per week*, would add up to Ramirez's previous salary of $30,000 per year.

74. Ramirez trusted that Temin was telling her the truth and accurately reporting the facts and the law. Ramirez, a newly-minted Swarthmore graduate, had no legal training or knowledge. Temin, by contrast, has been on panels with lawyers.

75. While Temin claimed that she could "not afford" to pay Ramirez more than $30,000 per year, Temin's finances and expenditures suggest otherwise:

   a. "Davia's preferred method of transportation is via private black car. Jimmy (Agim Kukaj) is a very trusted member of our team and Davia's primary driver." (Turnkey Document p. 72.) Jimmy drives a black Mercedes.

---

[6] It appears that Temin was possibly referencing (albeit inaccurately) the U.S. Department of Labor's revised overtime regulations, which set a wage floor for various overtime exemptions.

(Turnkey Document p. 78.)  Temin pays approximately $10,000 per *month* for her private driver.

b.  Temin's office space costs approximately $20,000 per month.

c.  Temin & Co.'s office is lavishly decorated with Asian art and various symbols/attempts at co-opting culturally significant practices.  For example, Temin has a "zen sand tray" (Turnkey Document p. 105) in the lobby and a hanging Japanese scroll (Turnkey Document p. 104).  The office has largely gold decor, including many Buddhas; it also features scrolls with writing from various Asian cultures hanging in the office.  She does not speak or read any of the languages featured on these scrolls, so she hung some of them upside down and often confused one language for another (for example, Temin could not tell the difference between Chinese and Japanese characters).

d.  Temin maintains residences in Montauk and Ohio as well as two apartments (including a penthouse) on the Upper East Side. (Turnkey Document, p. 8)

e.  Temin keeps expensive/designer place settings in the office for lunch meetings: "We have beautiful, expensive china that is to be used for these occasions and handled with the utmost care. They are kept in the cupboard above the microwave. There are also turquoise-rimmed Kate Spade plates that we put out for guests, located in the closet behind the front desk.  The cutlery to use is the square-handled set on the sink in the glass canister labeled "Davia's utensils." Gold placemats are stored under the fax machine, below

the front desk; extras are in Davia's office, in the left-hand drawers below the TV and phone." (Turnkey Document p. 82.)

76.     On January 9, 2018, Clarke (the COO) emailed Ramirez her new pay information. She wrote that Ramirez's wage would be $14.50 per hour, meaning Ramirez's gross pay for the year would be a little over $30,000 per year.

77.     Once Ramirez became an hourly employee, Defendants instructed her to send her hours (the time Ramirez came in the office and the time she left) to Temin and/or Rachel Clarke (the COO) by email at the end of each day, which Ramirez did. Defendants did not give Ramirez a formal timesheet.

78.     Temin did not give her employees online access to their ADP payroll and wage accounts, even though it is a standard business practice to give employees access to their electronic paystubs. Instead, Temin & Co. mailed employees their paystubs after every pay period.

79.     Just as during her "internship," Ramirez consistently worked over forty hours per week. Typically, she worked between fifty and sixty hours per week, but sometimes worked upwards of eighty hours per week.

80.     While Temin paid Ramirez $14.50 per hour, she billed Ramirez out to clients at approximately $200 to $300 per hour, depending on the client. On information and belief, Temin sometimes gave Ramirez a title boost when communicating with clients in order to bill them more for Ramirez's work. Temin never actually promoted Ramirez and never paid her for all of her hours.

81.     Temin did not allow Ramirez to take lunch breaks, and criticized her for taking any other breaks.  If Ramirez was gone for more than fifteen minutes, Temin would make her displeasure known.

82.     On one occasion, Ramirez stepped out for thirty minutes to make a phone call regarding a personal matter.  When Ramirez returned, she was told that any breaks lasting thirty minutes or more needed to be marked on her calendar.

83.     Temin often kept Ramirez at the office late into the evening to speak about personal matters not appropriate for the work environment.  Ramirez almost always had work she needed to complete, but would have to put it on hold to minister to Temin's emotional needs.

84.     Temin would tell Ramirez about her problems at home with her elderly husband, recount stories of sexual harassment and assault she had dealt with (without asking Ramirez if it was alright to unload her emotional baggage onto her), and would even cry to Ramirez and tell her about how hard things were for her.

85.     After these late-night sessions, Temin would ask Ramirez to get her coffee or would spring a difficult research request on her.

86.     The days after keeping Ramirez late at night to perform emotional labor at her impromptu therapy session, Temin would berate Ramirez for unfinished work.

87.     Defendants never paid Ramirez anything for any of her work over 40 hours a week; Temin & Co. did not even pay straight-time for work over 40 hours a week, much less the time-and-a-half required by law.

88.     At all times, Ramirez was performing work to the use and benefit of Defendants, who retained the use and benefit of her work; Defendants were aware of Ramirez's work hours and suffered and/or permitted her to work.

89.     For comparison's sake, Ramirez's nineteen-year-old cousin, who did not have a college degree, earned more than Ramirez while working at a movie theater being paid minimum wage.

90.     When Galina Fendikevich, another hourly employee at Temin & Co., complained to Temin about not being paid overtime, Temin declared: "I don't pay overtime."

91.     Fendikevich started out as a Research Assistant at Temin & Co. in October 2016 while she was finishing her undergraduate degree at the New York Institute of Technology.

92.     Fendikevich is a White woman of Eastern European descent.

93.     Defendants paid Fendikevich approximately $18.00 per hour (compared to Ramirez's $14.50 per hour) for her work as a Research Assistant.

94.     In November 2017, Temin promoted Fendikevich to become the Marketing and Editorial Associate.  At some time after Fendikevich's promotion, Temin raised her hourly wage to approximately $22.00 per hour.

95.     Temin often berated Fendikevich, made her work long hours without paying her overtime, and misclassified her as an "independent contractor" with Form 1099 earnings the entire time she was there, despite the fact that Temin controlled Fendikevich's work such that Fendikevich was properly classified as an employee entitled to Form W2 earnings.

96.     Temin complained to Ramirez that Fendikevich acted like a "sorority girl" and that she was not as smart or as serious as the rest of Temin's employees.  Temin criticized

Fendikevich for graduating from NYIT instead of an "elite" institution and for being from Rochester, New York.

97.     Fendikevich resigned from Temin & Co. in July 2018 after Temin denied her a raise and told her that she would not pay her overtime.

98.     On January 4, 2018, New York City was hit by a severe snowstorm that affected bus and train service.  Even schools closed down - a rare occurrence in New York.

99.     Ramirez alerted everyone at around 6:30 a.m. that she would not be able to make it into the office because of the weather, but that she would be working from home and would be available via phone and email all day.  Ramirez finished work at approximately 6:30 p.m.

100.    About nine months later,  Rachel Clarke (the COO) informed Ramirez that Temin had counted the day Ramirez worked from home as a vacation day (without ever informing Ramirez) because she did not view Ramirez's work from home as truly working.  Meanwhile, three of Temin's employees consistently worked remotely and were paid for their time.

101.    On September 15, 2018, Ramirez calculated how much she made in the most recent pay period from September 1, 2018, to September 15, 2018.  After working well over 105 hours, she had made only $885 after taxes.

102.    Temin & Co.'s executive team consists of three long-term employees. Rachel Clarke, a mixed race woman (Korean and White), is the COO.  Trang Mar, an Asian woman, is the Chief Client Engagement Officer.  Suzanne Oaks Brownstein, a White woman, is a Managing Director.  The executive team typically worked remotely.

103.    Most of the time, only Temin and employees who were not part of the executive team (like Ramirez) were physically present at the office.

104.    When Ramirez started at Temin & Co., the employees who consistently reported to the office were Galina Fendikevich, Beilin Ye, and Davia Temin.

105.    Employees at Temin & Co. had an Outlook email account for work, but all employees aside from Temin also used Google Chat to communicate with each other.

106.    Temin expected employees to use their personal email accounts and phone numbers for any urgent communications (emails, calls, and texts).  She would become angry with Ramirez if Ramirez's phone ever died or if Ramirez expressed any discomfort with sharing her personal contact information.

107.    Beilin Ye, a woman of East Asian descent, was Ramirez's direct supervisor. Defendants paid her an annual salary starting at about $45,000 and eventually gave her a raise to about $57,000.

108.    During her entire tenure at Temin & Co., Ramirez was the only Black employee at the company.

109.    Temin once wrote for Forbes.com, "In most cases, white women can have little insight into what a black professional woman's road has been. [...] The levels of bias, overt and unconscious, can be stunning. They can encompass everything from off-hand comments and assumptions to outright hostility and illegal behavior such as sexual harassment or worse."[7]

110.    And what was Temin's recommendation for Black women experiencing discrimination and harassment at work?  Essentially, to deal with it:  "Coping mechanisms, the ability to shrug off offense and not let it affect [their] self-esteem, grit, resilience, and tenacity are all critical qualities. [...]. Even if code switching, [Black women] **also need to adapt to the**

---

[7]https://www.forbes.com/sites/maryannreid/2019/08/15/when-white-women-are-not-allies/#483e63f35da0

18

**prevailing culture, at least enough to be recognized and valued**. And they need to be able to articulate their strategies and vision for themselves, so no one misunderstands their actions or motives."[8] (emphasis added)

111.    Temin expected Ramirez to "adapt" to Temin's discrimination, harassment, and refusal to pay accurate wages and overtime.

### Temin Demotes Ramirez to the Company's Housekeeper

112.    Temin began excluding Ramirez from events and meetings.

113.    One of Temin & Co.'s clients has an awards dinner every year. On May 9, 2018, the day of that year's award dinner, Brownstein asked Ramirez if she was attending.

114.    All employees at the firm were attending, except for Rachel Clarke (who lives in California) and Galina Fendikevich (who was on vacation). Mar came in from Pennsylvania for the event and Brownstein even traveled from Florida to attend.

115.    But Temin never invited Ramirez to the event.

116.    At first, Ramirez thought she was excluded from the dinner because she was just a Research Assistant. But Fendikevich attended the awards dinner the year before, and she was a Research Assistant just like Ramirez at the time.

117.    All the employees at Temin & Co. had a regularly scheduled team call every week. On July 10, 2018, after Fendikevich submitted her two week resignation notice, Temin decided that the weekly team calls would be replaced with weekly executive employee calls.

118.    With Fendikevich gone, everyone at the company was termed an "executive" except for Ramirez. Ramirez was the only employee excluded from the calls.

---

[8] *Id.*

119.     Temin's decision to exclude Ramirez from the weekly calls made it more difficult for Ramirez to stay updated on what was going on at the company. Ramirez felt out of the loop.

120.     On one occasion, there was a client meeting that Mar (Chief Client Engagement Officer) and Brownstein (Managing Director) travelled into the city for. Temin brought everyone on the team to this meeting except for Clarke, who works remotely from California.

121.     Ramirez and her colleagues were given a tour of the client's facilities and were to head to a meeting at the client's offices after a break.

122.     Temin sent Ramirez back to the Temin & Co. office to answer phone calls, while everyone else on the team attended the client meeting.

123.     Temin also did not give Ramirez the information she needed to conduct effective research. For example, Temin did not immediately give Ramirez access to ACT!, a customer relationship management software application that keeps track of client and prospect details in a single database.

124.     ████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
███████████████████████████

125.     Temin told Ramirez that she would not give her access to ACT! until she could trust her. But Temin gave other employees full access as soon as they started working at Temin & Co. Temin only expressed "trust" issues with Ramirez, the sole Black employee at her company, even though Ramirez had been a loyal employee and Temin had no reason not to trust her.

126.     At the beginning of 2018, Temin started having each of her employees submit individual activity reports every morning and evening that detailed every task and project they had planned for the day, and which of these projects they actually ended up working on or completing.

127.     After some time, every employee at Temin & Co., including Ramirez, fell out of the habit of sending these reports to Temin.  Even though Ramirez was not the only employee who stopped sending the reports, she was the only employee whom Temin consistently asked to submit her activity reports.  Temin also did not require any of her new hires, none of whom were Black, to submit activity reports.

128.     In July 2018, Temin moved Ramirez to the first desk one would see when entering the back office. Temin said she wanted to "keep an eye" on Ramirez.

129.     After moving Ramirez, Temin had other employees walk into Ramirez's office more frequently and constantly ask her what she was working on and when she would be finished.  Ramirez felt watched.

130.     Temin had employees hover over Ramirez so frequently that it interfered with Ramirez's ability to do her work.  Temin did not monitor any of her other employees like this.

131.     Temin introduced guests and potential employees to everyone on the team except Ramirez.

132.     Temin also made Ramirez perform menial tasks around the office, even though Temin had originally promised to help Ramirez build the skills necessary for the crisis management industry.

133.    Temin made Ramirez fetch her food and coffee, wipe down tables, vacuum floors, wash dishes, and repair the lamps in the office.

134.    ███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████████████████████████████████

135.    ███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████

136.    Temin had many expensive lamps all around the office.  Temin expected Ramirez to turn on all the lamps prior to Temin's arrival to work each day.  The lamps had varying levels of brightness, which would increase with each "click."

137.    ███████████████████████████████████████

███████████████████████████████████████

██████████████████████████"

138.    If Ramirez missed even one "click,"  Temin would become angry and berate her.

139.   Temin would complain about Ramirez to her colleagues.  She told them that she did not feel like she had a reason to keep Ramirez employed if Ramirez could not remember to turn on all of Temin's lamps.

140.   Once, Temin yelled at Ramirez for leaving one of the lamp shades tilted.

141.   Temin also yelled at Ramirez if she did not clean up the garbage in Temin's office or if she had not washed the dishes from the previous day.

142.   Temin operated off the pervasive racial stereotype of Black and Hispanic women as housekeepers.

**Is Temin *Really* a Feminist?**

143.   In September 2018, Temin hired Gloria Medina as a Marketing and Editorial Manager.  Medina is a white-passing Latina.  She is approximately thirty years old.

144.   Medina previously lived in China and spoke Mandarin fluently.  Temin was extremely excited when she learned about this.

145.   Medina's starting salary was approximately $75,000 per year.

146.   Temin opted to participate in Swarthmore's externship program again in 2019.

147.   On January 8, 2019, the externs (who were all female) arrived for the first day of their externship.  Temin called them into her office, along with Ramirez, Ye, and Medina.

148.   Temin gave an introduction to the company.  Part of her spiel was to differentiate between a crisis management consulting company (like Temin & Co.) and a public relations ("PR") consulting company.

149.   Temin said that the distinction was that "PR girls wear red fingernail polish" and go about pitching a story to journalists by saying, "Boy, do I have a story for you!"  She said this

as she pretended to chew gum and twirl her hair, insinuating that such women are unintelligent, unsophisticated, and primarily achieve results through flirtation rather than professional business communication.

150.    Temin then looked around the room at everyone's fingernails.  She said she wanted to make sure nobody was wearing red nail polish.

151.    Ramirez was the only one in the room who happened to have red nail polish on. Temin looked at Ramirez's nails, made a disgusted look, and then changed the subject.  Ramirez felt humiliated.

152.    Temin would refer to women she did not believe were intelligent as "sorority girls."

153.    Temin often opined to her female employees that her step-grandson was "much smarter" than her step-granddaughter.

154.    Temin constantly made sexually harassing and racially discriminatory comments about Ramirez's appearance throughout her time at Temin & Co.

155.    Some time in 2019, after attending a conference for Women of Color, Temin approached Ramirez to offer her hair care products.  Ostensibly, these products were marketed as being for people with tightly-curled hair, as is typical in people of Black ancestry.  But these particular products were designed for someone with an entirely different hair type than Ramirez's: they were for people with relaxed hair, protective styles, or locks--all styles that are frequently worn by Black women.  Temin was apparently assuming that Ramirez could use these products simply because she was Black.

156.    Ramirez (a tall, curvy woman) was encouraged multiple times to invest in some good shapewear, which is compression clothing designed to be worn under clothes to create a slimming effect (like girdles, corsets, or Spanx), to avoid looking what Temin would have considered "sloppy."

157.    In 2019, Temin & Co. encouraged Ramirez to wear a corset while at work.

158.    The corset left scars on Ramirez's body that only recently began healing.

159.    Temin & Co.'s expectations about Ramirez's body and appearance led to Ramirez having to spend significant money on clothes; Ramirez was constantly criticized for her clothing.

160.    When one of Ramirez's non-Black colleagues wore a t-shirt and slacks, an outfit not up to par with a business-formal dress code, Temin did not say anything.

161.    But Temin told Ramirez that hoop earrings, even tiny dainty gold ones, were unprofessional.  Hoop earrings are often associated with and worn by Black and Latina women.

162.    Temin once told Ramirez that her "bold" lipstick (Ramirez wore lipstick in red, brick red, and darker maroon) was unprofessional.  But when Ramirez's lighter-skinned colleagues wore some of the same colors, Temin never criticized them.

163.    Temin would discuss her latest diets and talk constantly about weight loss, creating an atmosphere that micro critiqued womens' bodies.   Temin would make unsolicited compliments to Ramirez when she perceived that Ramirez had lost weight, like after Ramirez began to wear the corset to work.

164.    All of Temin's comments and actions surrounding Ramirez's body, appearance, weight, and dress made Ramirez feel uncomfortable in her own body, lowered her self-esteem, and caused her stress, making it harder for her to do her job.

**Temin on Intersectionality and the "Right" Kind of Diversity**

165.    On March 06, 2019, Ramirez attended a meeting with Temin and two men named Victor and Robert, who were working on Temin & Co.'s website.  They were brainstorming words to describe a new marketing intelligence firm that they were attempting to form.

166.    The word "intersectional" came up.  Temin commented, "Ah, my least favorite word."

167.    "Intersectionality" refers to "the interconnected nature of social categorizations such as race, class, and gender as they apply to a given individual or group, regarded as creating overlapping and interdependent systems of discrimination or disadvantage."[9]

168.    Much as some White pop-culture commentators may deride the term "intersectionality" because of its multicultural implications, intersectionality is simply the reality that defines Ramirez's life.  She is a woman of Afro-Latina of Dominican heritage.  She has experienced discrimination and stereotyping because of the combination of these categories.

169.    Ramirez was shocked to hear that Temin, the CEO of a crisis management firm, would reject the concept of intersectionality; it was tantamount to rejecting who Ramirez is and devalued her as a person.

170.    Temin's statement showed Ramirez that Temin was either ignorant or apathetic toward the struggle of minority women and gender- expansive people.  Temin's version of feminism centered on the experience and perspectives of wealthy White women; it left no room for Ramirez and her colleagues of color.

---

[9] https://www.lexico.com/en/definition/intersectionality

171.     On June 5, 2019, Ramirez was on a team call.  One of her colleagues was out of the office because she was going to be an extra in "In the Heights," a musical.

172.     Managing Director Suzanne Oaks Brownstein referred to this colleague being an extra, saying, "That's so cool.  I would love to be in [the musical] but I'm sure I'm not the type of person they're looking for."  She elaborated, "You know, a 50-year-old White woman."

173.     Temin responded, "But diversity!"  Then, she lowered her voice and said, "The *right* kind of diversity."  Temin was insinuating that the "right" kind of diversity included more White people, not people of color.

174.     Brownstein said, "But it's set in Washington Heights.  That's not my space."  Temin replied, "But what about inclusivity?  Things are changing.  If you want to be inclusive, you've got to include everyone."

175.     Clarke agreed with Temin and added that her niece lived in Washington Heights.  Ramirez said, "It's most likely due to the gentrification of the area."  Temin scoffed at Ramirez's comment.

176.     On one occasion in 2017, Temin began telling Ramirez about former clients she had coached.  The first client she discussed had a heavy accent, according to her.  She mentioned how she told the client to work on their accent because it would hinder their success down the line.

177.     The second client Temin mentioned had curly hair.  She complained about how "messy" this woman's hair was.  Temin said she had to tell the woman to style her hair differently because her curly hair would negatively impact her image.

178.     Temin then looked at Ramirez and said, "But your curly hair is fine."

179.    The conversation made Ramirez uncomfortable, but she did not say anything to Temin because she was just starting out at Temin & Co. in 2017.  She tried to give Temin the benefit of the doubt.

180.    Temin also made comments to a prospective female employee that her boyfriend's dreadlocks were unprofessional.  The prospective female employee was not black, but her boyfriend was.  She did not accept the position.

181.    While Temin made every one of her employees practice their "phone voice" at the beginning of their employment, she did not criticize them after that.  Temin targeted Ramirez constantly about how she sounded over the phone throughout her time at Temin & Co.

182.    █████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████

183.    On many occasions, Temin told Ramirez that she sounded "angry" over the phone.  Temin never told any of Ramirez's colleagues, all of whom were not Black, that they sounded angry.

184.    Temin's comments stereotyped Ramirez as the "angry Black woman."

185.    Temin made Ramirez practice answering the phone countless times.  Temin specifically solicited sample phone greeting recordings from other non-Black employees and instructed Ramirez to use them as "examples."  Temin once made Ramirez spend fifteen minutes

working on her "phone voice." Temin told Ramirez that Ramirez did not sound "warm and competent" on the phone.

186. On several occasions, Temin shouted at Ramirez about her "phone voice."

187. Temin's comments and observations made no sense except as the result of racial stereotypes. Ramirez is a friendly person, and her manner of speech is typical of a highly-educated person; there is no noticeable difference between how she sounds and how any other educated professional sounds.

188. Temin put Ramirez in a no-win situation with regard to her manner of speech.

189. When Ramirez tried to overcompensate for what Temin labeled as her "angry" voice, Temin told her that she sounded like a "sorority girl," the term she used to describe women she believed were unintelligent.

190. Temin relied on a well-known stereotype that portrays Black people are incompetent and stupid.

191. Temin also made negative comments to Ramirez and others about women of color in leadership positions. For example, Temin constantly told clients that she hated Congresswoman Alexandria Ocasio-Cortez. Like Ramirez, Ocasio-Cortez has referred to herself as Afro-Latina. Temin blamed Ocasio-Cortez for losing New York City money when Amazon withdrew its plans to open a location in Queens. She made disparaging remarks about Ocasio-Cortez to employees as if it were an obsession. Though Temin might now claim that these comments were solely a result of political beliefs, the facts suggest a racial element. There are many politicians, both locally and nationally, who share Ocasio-Cortez's political views and who opposed the proposed Amazon deal. But Temin focused her vitriol on Ocasio-Cortez.

192.     Temin also told Ramirez and other employees that she did not like Valerie Smith, the President of Swarthmore College, because Temin did not find her to be "warm and competent," among other negative comments about Smith.  Valerie Smith is a Black woman and the first Black president of Swarthmore College.  These negative comments directly keyed into stereotypes about Black women as supposedly cold, angry, and incompetent.

193.     On information and belief from Ramirez, Temin performed some paid crisis management work for Swarthmore College at some point working on sexual assault survivor issues and issues around divestment, advising on student protestors, but lost this contract at some point, although she continued to serve on Swarthmore's Board of Managers.  Temin also disparaged student protestors at Swarthmore College, mocking them as "entitled," among other comments.  Temin obsessed: she personally tracked some of these individuals post-Swarthmore, commenting in disgust when one recent graduate participated in a political protest against a Trump official and made the news.

194.     When students at Swarthmore comprising survivors of sexual assault and their allies demanded then-Dean Elizabeth (Liz) Braun's removal, and Swarthmore finally took action, Temin openly blamed and disparaged Valerie Smith for this decision, and even invited Braun (a White woman) to her office twice to help her with her job search.

195. █████████████████████████████████████████████████████████

███████████████████████████████  ████████████████████████████████

███████████████████████████████████████████████

### Temin's Philosophy: Wealth Over Health

196.     Temin experienced a traumatic car crash approximately seven years ago. Her right leg was seriously injured. She experienced immense pain and was hospitalized for over a month.[11]

197.     Temin wrote about the effect the experience had on her: "After going through my own crisis, I can be more effective, more -- to use an overused word -- authentic in helping others"[12]

198.     But Temin did not extend empathy to her employees; she expected them to put their work before anything else, including their physical and mental health.

199.     On January 11, 2018, Ramirez had an exploratory laparoscopy to diagnose possible endometriosis, a painful physical disorder affecting a woman's uterus.

200.     After the surgery, Ramirez's surgeon told Ramirez that she would need at least a full week off work, but that she recommended that Ramirez take two weeks off, especially since the surgeon had taken five biopsies. The surgeon told Ramirez that if Ramirez could not take that much time off, she should work from home rather than going into the office.

---

[10] ████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
███████████████████████████████████

[11] https://leanin.org/stories/davia-te██in

[12] *Ibid.*

201.    Ramirez emailed Temin when she got home and told her the doctor's recommendation.  She requested to work from home, since Temin & Co. only allowed her five sick days for the year.

202.    Temin replied: "The timing is a bit more than expected. Thank you for your offer, but your position is based at the office, so we will have to use your sick days for the home rest. Too bad that that is the week the externs will be here...  But, can't be helped."

203.    When Ramirez started at Temin & Co., she had informed Temin (for the sake of transparency) that she would likely be having surgery for her condition.  At the time, Temin responded that Ramirez would be able to take time off as needed.

204.    On June 3, 2019, Temin told Ramirez to take one of her many lamps to be repaired.  Ramirez had informed Temin previously that she had a doctor's appointment that day. Ramirez had had an anaphylactic reaction to shellfish a few weeks prior and she had marked this appointment on the calendar immediately after the incident.

205.    The lamp was large and cumbersome.  Because she had back pain and it was hot outside, Ramirez asked Temin if she could take a car to the repair shop.  Temin said Ramirez could go with her driver, Jimmy, since he had just dropped Temin off at the office.

206.    Ramirez contacted Jimmy, but he said he left immediately after dropping Temin off.  He agreed to come back later in the day, shortly before Ramirez had to leave for her doctor's appointment.

207.    Jimmy arrived late, after Ramirez was supposed to leave to make it to her appointment on time.  Ramirez met him downstairs and told him that she was running late and

could not take the lamp to the repair shop. Jimmy offered to drop it off instead. Jimmy did things like this all the time for Temin and Ramirez knew that Temin trusted him, so she agreed.

208.    Jimmy had an issue with the cashier at the repair shop regarding a receipt. The next day, he told Temin about this issue. Temin became extremely angry.

209.    When Temin arrived to work that day, she immediately stormed into Ramirez's office. Ramirez had her headphones on, but removed them and set them down when she saw Temin come in.

210.    Temin raised her voice and said, "Yeah, I want you to take them [Ramirez's headphones] off!" In an elevated tone, Temin demanded that Ramirez answer why she did not go with Jimmy to get the lamp repaired.

211.    Ramirez explained to Temin that she was running late to a doctor's appointment and that Jimmy had offered to take the lamp himself. Temin went from elevated to enraged. She screamed, "You have a personal life and things to do for work--and work comes first!"

212.    Ramirez replied, "My health comes first. Without my health, I can't do this job." Ramirez went on to explain that Jimmy had arrived late, so she could not accompany him to the repair shop.

213.    Then Temin yelled more at Ramirez, saying she wanted her to take responsibility for what happened. Ramirez replied, "I'm sorry I didn't go with him, but I did have somewhere to be and the entire team was made aware of that well in advance."

214.    Ramirez suffers from migraines, which she told Temin about on multiple occasions. Sometimes at work, Ramirez would get a migraine or start feeling dizzy. Ramirez would tell Temin whenever she felt this way. Ramirez would ask for a break to get some food or

to take her migraine medication, but Temin was rarely sympathetic. Temin would still instruct Ramirez to do physical office housework, fetch her multiple meals, and run errands all over the city, even when Ramirez told her she was feeling ill.

215.    On April 8, 2019,  Temin stormed into her office and started yelling.  She was furious that no one had turned on the lights in her office before she arrived.  She shouted, "I pay people to do shit and you all can't do anything right!"

216.    Temin then turned to Ye and commanded her to turn on all the lights in every room in the office, including Ramirez's, screaming, "I don't want anyone sitting in the dark ever again!"

217.    Ramirez told Temin that she had a migraine and was experiencing terrible light sensitivity.  There were no guests coming into the office that day, so Ramirez asked if it was possible to keep the lamps off in her office because of her migraine.   It is well-known that migraines can be triggered and exacerbated by light.

218.    Temin snapped, "No. I don't care!"

219.    Temin & Co. served Girl Scout cookies to clients and other guests when they came into the office.  Temin put Ramirez in charge of making the Girl Scout cookie order for 2019.

220.    While looking at Temin & Co.'s cookie stock, Ramirez found that Temin & Co. had boxes of expired cookies with "use by" and "freeze by" dates from 2017 and 2018.  Ramirez calculated that Temin & Co. would need to order twice as many cookies as the year before based on how many boxes were used and expired.

221.    Temin argued with Ramirez about ordering more cookies.  Temin said that she "didn't believe in expiration dates" and felt fine serving expired cookies to clients and guests.

222.    Ramirez made her discomfort known about serving the expired cookies to other people.  She told Temin that she did not want someone to get sick from eating the expired cookies.

223.    On one occasion, Temin held a fundraiser at the Temin & Co. office for a friend of hers who worked with rape and genocide victims.  After the event, Temin told her employees, including Ramirez, that her friend had not given her enough credit and gratitude for holding the event.

224.    In an apparent attempt to "get even" for this perceived slight, Temin refused to return a case of wine her friend had planned to sell to benefit rape and genocide victims.  She spoke to Ramirez and others about not giving the wine back.

225.    Temin instead kept the benefit wine for herself and gave one bottle from the case to each employee at the office, including Ramirez.

226.    On July 10, 2018, Ramirez came to work wearing a medical boot on her foot; she had injured her foot and had to wear the boot for a couple of weeks.

227.    Despite seeing that Ramirez was injured, Temin had Ramirez vacuum the office. Temin also made Ramirez bring Temin food and coffee, and do other physically demanding work around the office while Ramirez was visibly injured.

228.    Temin often tasked Ramirez with cleaning the entire office, which included dusting.  Ramirez has a severe dust allergy that she informed the team about several times.

229.    Temin disregarded Ramirez's health condition and had her dust the office anyway.  Ramirez would end up wheezing, with hives on her face, after dusting parts of the office that had been neglected since before she had started working at Temin & Co.

230.    Temin also required Ramirez to vacuum the entire office.  To be able to vacuum in Temin's office, Ramirez had to plug the vacuum into a surge protector which was plugged into several more surge protectors.  Temin had several computers and lamps plugged into one circuit.

231.    This practice was extremely unsafe.

232.    ████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████

233.    But Temin did not take any steps to fix this issue and create a safer work environment for her employees.

234.    Instead, Temin became extremely angry and yelled at Ramirez when the fuse blew because of the overloaded circuit.

235.    In fact, on one occasion when the fuse blew, Temin ordered Ye, who was very pregnant at the time, to climb behind her desk and attempt to fix the fuse and the situation. There were multiple surge protectors behind the desk, and Ye did not feel safe, but she did it anyway out of fear.

236.    In August 2019, Beilin Ye left on maternity leave.  Ye gave birth two days prior to her scheduled leave.  Temin told Ye that she owed Temin money or work for the two days of work she missed.

237.    Before Ye went on leave, Temin often berated her and forced her to work long hours even though she was pregnant.  Ye worked 14-hour days leading up to the day she gave birth. She even kept working while she was having contractions.

238.    On a team call after Ye had given birth, Temin stated that she wanted to fire Ye because she didn't finish updating the office's Turnkey Document before she went into labor.

239.    On August 16, 2019, Ye resigned from Temin & Co. by sending an email to Temin.  Ye wrote in the email that on a phone call, Temin claimed that Ye owed her two days of work because she went into labor early.  Ye wrote that Temin told her that she could either pay her for those days or go into the office and help onboard a new hire.

240.    Ye stated that she would have been happy to help onboard the new hire, but that Temin ended their phone call by accusing Ye of having anger management issues and saying that Ye could not even pick up her personal items from the office.

241.    Temin only paid Ye up until the last full day she worked.

242.    Ramirez had to press Temin to mail Ye her personal items to her new address.

243.    When Trang Mar (the Chief Client Engagement Officer) was pregnant and on maternity leave, Temin was visibly angry about it.  She made comments to Ramirez about how Mar would be back within a week, and even tried to have Mar return to work early to attend an event.

**The #MeToo Index**

244.     At Temin & Co., Ramirez spent most of her time (when she was not running errands for Temin and cleaning the office) working on one large project: the "Temin #MeToo Index."

245.     At the beginning of the #MeToo movement, several journalists contacted Temin because of her crisis management expertise.  Temin decided that she wanted to compile a list of all high-profile men accused of sexual misconduct; she gave Ramirez the assignment.

246.     Ramirez started putting together an Excel spreadsheet with information on when these men were accused, by whom, where it was reported, how many accused them, etc. and it grew from there as clients and journalists requested more information.

247.     The "Temin #MeToo Index" is a compilation of data on 1300+ high-profile people who have been accused of misconduct since December 2015, along with the response to accusations from their companies as well as the media.

248.     Ramirez performed most of the work on the #MeToo Index;   Ramirez's colleagues helped her analyze her data only on a few occasions.

249.     Temin & Co. received a lot of publicity thanks to Ramirez's work: many publications, including Bloomberg, MarketWatch, and American Banker, featured the #MeToo Index.

250.     Many Temin & Co.'s clients used Ramirez's analysis of the data to create sexual misconduct awareness programming and media response training.

251.     Temin used Ramirez's intellectual labor on reporting of sexual violence in the workplace to participate in interviews on best practices in handling survivors coming forward.

252.	On April 29, 2019, Temin called Ramirez into her office.  Temin told Ramirez that a huge recruiting firm had contacted Temin & Co. about doing a workplace harassment training after seeing the company's work (most of which was produced by Ramirez) on the #MeToo movement in Bloomberg and elsewhere.  The recruiting firm wanted to partner with Temin & Co.

253.	Temin told Ramirez that her work was "not for nothing."

254.	Then Temin said, "I know sometimes you must want to wring my neck with that beautiful hair of yours..." She paused; Ramirez felt like Temin was waiting for her to say "no." Ramirez did not respond--she felt uncomfortable with Temin's reference to her hair and to violence.

255.	On June 10, 2019, Temin presented her team with a draft press release.  In it, Temin wrote, "While not every allegation is true of course, - our estimate is that c. 80% of accusations are valid, while 20% are overreaching or invalid - the trend of surfacing workplace sexual assault is critical to the evolution of our culture, and society's efforts to stop these abuses."

256.	Just a few months earlier, on April 1, 2019, Temin stated to *The Phoenix*, Swarthmore College's student-run newspaper, saying, "Every woman in my generation has had this, has been sexually harassed."[13]

257.	On a call regarding Temin's press release draft, Brownstein (the Managing Director) said to Temin, "That sounds like you believe twenty percent of all women are liars." Temin retorted,  "That's exactly what I believe."

_____

[13]https://swarthmorephoenix.com/2019/04/01/board-of-managers-profile-davia-temin-on-metoo-business-and-finding-her-path/

258.     The crisis management field depends in large part on emphasizing "plausible deniability" for companies and executives accused of misconduct.

259.     Temin & Co. focused its marketing efforts on obtaining business from companies and men who had been accused of misconduct or covering up misconduct.

260.     Because of her marketing efforts, Temin had a financial incentive to inflate the percentage of women who are exaggerating or fabricating allegations.  Issuing a press release asserting that such a significant percentage of allegations are unfounded suggests to clients that they can trust Temin to deploy statistics that will back up "plausible deniability."

261.     But there was just one problem with Temin's assertion: it was not true.

262.     Temin's claim that twenty percent of sexual harassment allegations are unfounded was simply made up by Temin--but Temin portrayed it as if it were based on scientific research and data.

263.     The baseless claims in Temin's proposed release created ethical concerns for Ramirez and others.

264.     Ramirez and other members of the team challenged Temin's numbers.  Ramirez could not find any data to back up the numbers Temin put forth in the draft statement.  Ramirez even showed Temin statistical data from RAINN (The Rape, Abuse and Incest National Network) that showed Temin's claims were baseless.

265.     Temin stood by her draft press release until Ramirez and other team members advised her that she could suffer backlash from the media, and it would counter her assertions with real statistics backed by data, like the statistics Ramirez found.

266.    In April 2019, Temin hired Amy Cao, a woman of East Asian descent in her mid to late twenties, as the Manager of Marketing and Business Development.  Temin gave Cao a starting salary of $70,000 per year.

267.    Temin almost never gave Cao any clerical work; she assigned Cao meaningful work from the beginning.

**A Culture of Surveillance**

268.    On May 14, 2019, Ramirez found a Nest camera hidden in the back of Temin's office.  The camera appeared to be on and functioning.

269.    Ramirez had not been told that Defendants had video recording devices in the office, and she had not consented to being recorded by Defendants.  Ramirez did not know at the time that this is illegal in New York, so she did and said nothing.

270.    █████████████████████████████████
████████████████████████████████████████
████████████████████
        █████████████████████████████████
        ██
        █ ████████████████████████
        █ ████████████████████████████████
        █████████████████████████████████
        █████████████████████████████████
        ████████████████████████████



271.

272.    Temin & Co. recorded client and employee conversations without any regard to where they were located; and with regard to clients, without their knowledge or consent.

273.    Although employees knew they were being recorded, they did not consent and felt they had no power to refuse to be recorded.

274.    Swarthmore College, a former client of Temin & Co., is located in Pennsylvania, which is a two-party consent state.

275.    According to Swarthmore's website, Temin currently serves on the Swarthmore Board of Managers.  In this capacity, she almost certainly has to participate in calls regarding these responsibilities with people in Pennsylvania.  On the Turnkey Document, under "Frequent Callers/Important People to Know" she lists as her Swarthmore Board contacts the following

three people, all of whom are based in Pennsylvania: Valerie Smith (President of Swarthmore College), Karl Clauss (V.P. of Development at Swarthmore College), and Jenny Gifford (President Valerie Smith's executive assistant).

276. ███████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████

277. On many occasions, Defendants tasked Ramirez with transcribing a recorded client call. She would have to listen to the call (which was usually over an hour long) and manually transcribe what she heard.

278. Ramirez suggested to Temin that the company invest in a digital transcription service to save time and allow employees to use their time in more productive ways. Temin rejected Ramirez's idea. But when one of Ramirez's non-Black colleagues made the same suggestion to Temin, Temin accepted it and gave that colleague credit for the idea.

279. On one occasion, Temin and the team laughed at Ramirez during a team call for suggesting that Temin & Co. collaborate with a research team at a school like Stanford University or Harvard University on the #MeToo index, since these schools had better resources and more experience with the type of dataset Ramirez was working with and could possibly provide more sophisticated data analysis tools and expertise.

280. Ramirez felt discouraged and lost self-esteem; she stopped making suggestions about how to make Temin & Co. more efficient and ways to bring the company more business.

281.     Temin also had her employees secretly record her salons, which were events where Temin hosted her most important clients in her office.

282.     According to the Turnkey Document, "[Temin] started hosting a series of high-level salons in [the Temin & Co.] offices, to 'bring together many of the smartest people I know over champagne and conversation.' They feature 'a broad array of world-changing thinkers, artists, writers, journalists, scientists, filmmakers and business and NGO leaders. The audience is a wonderful mix of some of the smartest, most accomplished, compelling, committed and innovative thinkers I know.' The only goal is to 'explore new ideas, through a series of fascinating speakers.'" (p. 98.)

283.     Again, Temin explicitly instructed her employees to record her salons without the knowledge or consent of her guests. The Turnkey Document states: "Davia likes to record the salons. [...] When Davia calls the start of the salon, you will need to place it along the chair rail, just behind or next to the Japanese scroll, where the speakers will be standing/talking – **do these discreetly!** Try to catch Davia's eye to let her know that the recorder is there and turned ON to record. After the speaker and Q&A portion is over, you will need to retrieve the recorder and turn it off (otherwise it will continue to record the noise of the mingling guest, or worse, get stolen)." (Turnkey Document p. 108; emphasis added.)

284.     Temin's salons presented a perfect opportunity for her employees, including Ramirez, to meet, learn from, and network with Temin's high-profile guests. But Temin did not allow it; instead, she expected her employees to perform waitress and busser work. Throughout the evening, Ramirez and her colleagues would serve food and champagne, clean up after Temin and her guests, and arrange the office furniture after the event. (Turnkey Document p. 109.)

285. In addition to the recording and videotaping, Defendants also engaged in online surveillance and intimidation of former employees.

286. A negative review of Temin & Co. appeared on *Glassdoor*, a website that allows former employees to post anonymously about their experiences.

287. In response, Defendants instructed a lawyer to reach out to former employees - who have little to no legal training - and threaten them with a non-disclosure agreement and insinuate that employees who raise concerns about their treatment at work on a website or other public fora are violating the non-disclosure agreement, and that consequences would follow.

**Temin Reacts Aggressively to Transitions in the Workplace**

288. In July 2019, Medina gave Temin notice that she would be resigning from Temin & Co. to attend law school. Instead of supporting Medina's career, Temin responded in anger.

289. Temin made unprofessional comments to Ramirez about Medina, stating that Medina "would make a horrible lawyer," and that she did not like her.

290. On July 30, 2019, Temin's anger about Medina leaving boiled over.

291. Medina had just come back from a media training for one of Temin & Co.'s biggest clients at the time. Temin had tasked her with filming the presentation.

292. Temin told Medina that she was not moving fast enough with the camcorder, aggressively grabbed Medina's wrist without her consent, and dragged her so that she would move faster.

293. On August 1, 2019, Temin informed Cao and Ramirez that Medina and Ye would be leaving Temin & Co. Ramirez and Cao would be the only employees left at Temin & Co. aside from Temin's three executive team members.

294. That same day, Temin promoted Cao to Director and raised her salary by $10,000 to $80,000 per year.

295. Temin gave Ramirez (who had been working at Temin & Co. longer than Cao and who had trained Cao when she started) a $2,000 bonus.

296. On August 7, 2019, right as she was about to call into a board meeting for a client, Temin ordered Ramirez to bring her a second cup of coffee. Temin told Ramirez that it did not matter if she was already on the call when Ramirez brought in the coffee.

297. When Ramirez returned with the cup of coffee, Temin was on the call, so Ramirez quietly walked over to Temin's desk. Ramirez tried to bring the coffee to Temin's attention by putting it right beside her.

298. Temin glared at Ramirez with an angry and cold expression in her eyes, lips curled into a frown, and smacked Ramirez's hand, causing Ramirez to spill the scalding coffee all over her hand, herself, and the carpet.

299. Temin did not apologize, or seem shocked by what happened, indicating to Ramirez that Temin's actions were intentional. She continued with her call as if nothing had transpired. She did not pause her call, or ask Ramirez if she was okay.

300. Ramirez felt a sense of shock after the incident. She walked out of Temin's office and went outside for a while to gather herself before returning to the office.

301. Ramirez later spoke with Temin and said: "That was not okay. You hit me. That is an assault."

302. Temin sneered in response and told Ramirez that she should apologize to Temin for interrupting her meeting (even though Temin had specifically asked her to interrupt the call by bringing Temin coffee).

303. Temin's physical aggression toward Medina and Ramirez were not isolated events. One day, Temin attempted to throw a paper shredder across the room when she did not like the way one of her employees had wrapped client holiday presents. She failed because the paper shredder proved too heavy for her to lift and throw.

304. Ramirez also believes that she has heard Temin throw things in her office when she has gotten angry. She has heard objects crashing into the floor from Temin's office during Temin's phone calls.

305. In August 2019, Temin hired a young South Asian woman as a Marketing and Editorial Associate. Temin started this new employee off at a salary of $53,000 per year.

306. This new employee, who was a national of Bangladesh, had just graduated from Swarthmore College that summer. She majored in Economics and Global Studies at Swarthmore College. She had experience in behavioral economics (like Ramirez) and was President of the International Students' Club at Swarthmore College.

307. This new employee was not a citizen of the United States, so Temin promised to sponsor her visa if she proved herself and did good work.

308. Unbeknownst to the new employee, Temin never actually had any intention to sponsor a visa: Temin brazenly told Cao that it was too bad that this new employee could only stay until April 2020, which was the longest the new employee could stay in the United States while working without sponsorship.

309.   Temin micromanaged this new employee from the beginning, even monitoring how much time she spent in the bathroom.

310.   Temin shouted at her for how she handled a potential client call when she had been at the job for less than a month.

311.   The new employee resigned from Temin & Co. after just a few months because of Temin's harassment and discrimination.  When she gave Temin her letter of resignation, Temin yelled at her and told her she ruined the company.

312.   From elsewhere in the office, Ramirez heard Temin's yelling when the new employee resigned.

313.   The new employee had to move back home to Bangladesh in December 2019 after leaving Temin & Co. because she was unable to find another job, since she had been promised sponsorship by Temin.

**Defendants Constructively Discharge Ramirez**

314.   In the fall of 2019, working on the #MeToo Index became very difficult for Ramirez.  She had been working on the project since she started working at Temin & Co., and the constant exposure to stories of sexual assault (coupled with long work days) were negatively affecting her mental health and making her physically sick.

315.   Ramirez told her colleagues about the work's impact on her mental and physical health.  She asked Temin if she could take a break from the #MeToo Index for just one week and work on another project.

316.   Temin avoided Ramirez for two days.  Ramirez brought up her request again.

317.     Temin replied, "Whatever you experienced must have caused some pretty bad PTSD."

318.     Ramirez told her that she did have prior life experiences that caused symptoms of PTSD that were triggered by work on the #MeToo Index.

319.     Temin proceeded to describe one of her experiences with sexual assault to Ramirez, despite acknowledging just moments prior that Ramirez must be dealing with PTSD from her own experiences.  Ramirez felt overwhelmed.

320.     Temin finally told Ramirez that she would take her off the project temporarily. She did not make any requests for data that day.

321.     But the very next day, Temin ordered Ramirez to work on the #MeToo Index again because a journalist had made a request for information.

322.     About a month later, Temin told Ramirez that if she had refused to work on the #MeToo Index project when Temin had asked, Temin would have fired her because she had nothing else for her to do.

323.     In September 2019, Temin assigned the new South Asian employee to work on the #MeToo Index project to help with some of the data analysis.

324.     The new employee discussed the #MeToo Index with COO Rachel Clarke. Clarke asked her to speak with Ramirez, because Ramirez created the Index and had done all the data collection, organization, and most of the analysis.

325.     Later, in a separate conversation about the #MeToo Index, Temin instructed the new employee to go to Clarke with any questions.

326. The new employee told Temin that she had already spoken to Clarke, and that Clarke had directed her to work through Ramirez on the #MeToo Index.

327. Temin responded, "No. Speak to Rachel. Kaitlyn knows nothing about the project."

328. When Ramirez found out about this conversation, she felt gutted. She had put in many hours (more than forty per week) working on this project, all while dealing with Temin's constant harassment, discrimination, and physical aggression. Temin could not even acknowledge her contribution or admit that Ramirez was knowledgeable about her own work.

329. In September 2019, Temin & Co. was preparing for an upcoming sexual harassment training for a huge client.

330. Temin gave Ramirez a list of discussion questions the client provided. The client was asking about the kinds of trends Temin & Co. had observed while working on the #MeToo Index. The client also asked for a large amount of very specific data that Ramirez did not have because Temin had not given her the means nor the authorization to collect such information.

331. Ramirez expressed concerns to Temin and the executive team about the fact that she did not have the data she needed to answer some of the client's questions about Temin & Co.'s observed trends.

332. Temin instructed Ramirez to "just estimate" what she saw. But Ramirez knew that the client wanted specific statistics and numbers, and she expressed this to Temin.

333. Temin essentially instructed Ramirez to "fudge" the numbers.

334. Ramirez refused to fabricate numbers. Temin and her company needed to be able to identify the sources for all of their data.

335.     Ramirez took time to scour the internet to try to find trends other researchers observed from their data.  Naturally, it was taking Ramirez a long time to answer these questions because she wanted to produce honest work.

336.     Ramirez told Temin and the team that answering the client's questions would take her more time than Temin had allotted.

337.     Temin yelled at Ramirez for not having the data.

338.     Temin then asked the new employee to help Ramirez answer the client's questions to speed up the process.

339.     Ramirez and the new employee divided the questions into two categories: questions specifically from the data, and questions that could be answered from other sources online.  Ramirez took the former part and the new employee took the latter part.

340.     Ramirez and the new employee stayed late several nights working on the project.

341.     Cao told them to send her updated drafts every few hours and came into the office every thirty to sixty minutes asking Ramirez and the new employee to give an elaborate update on where they were, and berating them for taking too long.

342.     Cao sent extensive edits late at night and expected her edits to be incorporated by the next morning.  Cao analyzed every line between drafts to see how much the new employee and Ramirez each got done.

343.     On the morning of September 20, 2019, Cao met with Ramirez and the new employee.  She took out two drafts of their answers to the client's questions and made them go through the documents question by question, having Ramirez and the new employee identify which one of them worked on each specific answer.

344.	Naturally, the new employee had answered more questions, since the questions she tackled did not involve collecting, analyzing, and explaining data.

345.	Cao told Ramirez that she was "disappointed" in her.  When Ramirez tried to explain to Cao why her part of the project was taking longer than the new employee's, Cao refused to listen.

346.	Cao told Ramirez that she was removing her from the project and handing it over to the new employee.  Cao told Ramirez that she was not doing enough.  Cao did all of this with the new employee present.

347.	Ramirez felt shocked and betrayed when this happened. She had worked on this project almost day in and day out; to be humiliated in front of her colleague for supposedly not doing enough on the project sent the message to Ramirez that Defendants wanted her gone.

348.	By this point, Ramirez had been repeatedly berated, harassed, and humiliated, and on top of that, her employer was micro-critiquing her work product.  No reasonable employee would feel it possible to continue working under such conditions.

349.	Later that day, Ramirez submitted her letter of resignation to Temin by email.

350.	After Ramirez resigned, Temin called Cao and thanked her for making Ramirez quit.

351.	Apparently, Temin had decided early on during Ramirez's tenure at Temin & Co. that she wanted to fire her.  She did not because she said "it would look bad," insinuating that she did not fire her was because Ramirez was the only Black woman at the company, and because Temin didn't want to put in the time and effort it would take to mentor Ramirez.

352. Instead, Temin had previously stated to Ye that she was aiming to force Ramirez to quit by not giving her promotions or raises, hiring people above her, and "paying her so little it's criminal," in Temin's own words to Ye.

353. Temin also made Ramirez clean the office and work on the #MeToo Index, which Temin knew was a triggering and emotionally draining project, because she wanted to push Ramirez to quit.

354. Nearly every week, Temin would tell Ye and other employees that she intended to fire Ramirez the following week, which hurt their relationships with Ramirez.

355. On September 27, 2019, the new South Asian employee who had hoped for visa sponsorship submitted her resignation letter to Temin in person. Temin yelled at this employee, accusing her of ruining Temin's reputation, stating that something like this had not happened in her 23 years of running this business, and calling it "appalling."

356. Temin was shouting so loudly that Ramirez could hear it in another part of the office.

357. Ramirez's last day at the office was on October 4, 2019.

358. Ramirez spent over two years at a job in which Temin promised her opportunities for learning and growth. Instead, Temin treated and paid Ramirez as if she were the office housekeeper.

359. Recently, Temin's conduct toward interns, externs, and/or employees has come under investigation from Swarthmore College. An Associate Dean of the College reached out to Ramirez and other former interns/externs/employees of Temin & Co. about the investigation, but

the outcome of the investigation has not been revealed. According to Swarthmore's website, Temin remains on the Board of Managers.

360. Ramirez experienced extreme emotional distress and its accompanying physical symptoms because of Defendants' treatment of her:

a. Ramirez grew up with weekly migraines but shortly after going to college, she was able to reduce the number of migraines she had to once per month or less. After three months at Temin & Co., Ramirez's migraines returned: she was getting two to three per week. Sometimes, Ramirez's migraines would last for days on end and be resistant to painkillers and even her specific migraine medications. She also developed eye floaters and aura only after she started working at Temin & Co. Ramirez consulted a neurologist because of these issues. Shortly after Ramirez resigned, the number of migraines reduced to twice a month and she rarely, if ever, experiences aura.

b. Ramirez developed bad acid reflux and had stomach aches and nausea because of the stress caused by Defendants.

c. Ramirez often had anxiety attacks as she woke up and on the way to work because she knew she had to go into the office and experience Temin. On Sunday afternoons, Ramirez's entire mood would shift because she knew she had to go into work the next day.

d. Ramirez experienced frequent insomnia. On many nights she would lay awake, unable to sleep. Ramirez started taking several doses of Benadryl to get a few hours of rest. Finally, she was prescribed Gabapentin and

anti-anxiety medication by her psychiatrist to help with the insomnia and the anxiety attacks.

e.  A year and a half into working at Temin & Co., Ramirez started drinking in order to deal with the stress Defendants inflicted on her. If she got out of work before 10 p.m., she would often order Chipotle margaritas and drink them on the way home, or go to a bar alone and attempt to drink away the stress. Prior to working at Temin & Co., Ramirez only drank alcohol socially, about twice a month. Since resigning from Temin & Co., she rarely consumes alcohol.

f.  Ramirez decided to see a therapist and psychiatrist because she was finding it a lot harder to stay focused and be efficient at the office. She thought it had to do with her ADHD. Both her therapist and psychiatrist suggested she leave her job right away.

g.  Ramirez had nightmares about Temin and working at the company. She still experiences these nightmares.

h.  After her experience working at Temin & Co., Ramirez had about $100,000 in student debt and had racked up additional credit card debt because her necessary expenses exceeded her monthly salary. Because she had no savings and would have no assistance from other sources, she felt at times that she could not leave the job. Ramirez also had trouble applying to other jobs because she was exhausted after spending late hours in a toxic workplace environment. Ramirez felt hopeless and felt like she had no way out.

i. Temin caused Ramirez to lose her self-esteem and self-assurance. As Temin said to the *Swarthmore Phoenix* in April 2019, "[T]he minute you are reduced to a body, the minute your mental functions are dismissed, people are staring at you, whatever they're doing, and it robs your self-esteem and your self-assurance and what does it take to achieve? Self-esteem and self-assurance."[14] Ramirez agrees.

j. Ramirez felt like she was constantly walking on eggshells, trying to avoid doing anything that would set Temin off into a fit of rage.

k. Working at Temin & Co. made Ramirez fearful and overly wary of entering a toxic workplace after leaving the company. She was embarrassed to tell her friends and family about her work experiences because she feared that either she was overreacting, or that she was in fact accurately perceiving that she was in a toxic workplace and was being abused because she allowed it.

361. It is critical for a person just entering the workforce to gain marketable skills and experience in a first job. But Ramirez has had trouble finding a new job because Temin did not provide her with the mentorship, skills, and training she had promised. And because Ramirez has already been employed, employers appear reluctant to hire her into an entry-level position.

362. Ramirez also suspects that Defendants have retaliated against her by interfering in her efforts to find new employment and will continue to do so in the future.

363. Ramirez brings this suit to stand up for her dignity and ensure that Davia Temin and Temin & Co. do not continue to abuse employees.

---

[14]https://swarthmorephoenix.com/2019/04/01/board-of-managers-profile-davia-temin-on-metoo-business-and-finding-her-path/

56

# CLAIMS

### FIRST CAUSE OF ACTION
### Violation of the New York City Human Rights Law
### N.Y.C. Admin. Code § 8-107 et seq.
### Sex Discrimination

364. Ramirez incorporates each and every foregoing and succeeding paragraph of this Complaint as if fully set forth here.

365. Ramirez is female.

366. Defendants took adverse action against Ramirez, including but not limited to disciplining her, constructively terminating her employment, and subjecting her to a hostile work environment.

367. Ramirez's sex was a motivating or other causally-sufficient factor in Defendants' actions.

368. Defendants' actions reflect gender stereotypes, including stereotypes about Black or Brown women as being subordinate, less capable, and suited for menial tasks like cleaning. Defendants also subjected Plaintiff to stereotyped gender expectations and punished Plaintiff for not conforming to Defendants' stereotypes. As a direct and proximate result of Defendants' unlawful actions, Ramirez has been damaged and continues to suffer damages, including but not limited to loss of pay and emotional distress.

369. Ramirez prays that the Court find Defendants liable for sex discrimination in violation of the New York City Human Rights Law, and grant all relief permitted by law, as set forth in the Prayer in this Complaint.

## SECOND CAUSE OF ACTION
### Violation of the New York City Human Rights Law
### N.Y.C. Admin. Code § 8-107 et seq.
### Race Discrimination

370.    Ramirez incorporates each and every foregoing and succeeding paragraph of this Complaint as if fully set forth here.

371.    Ramirez is of partially Black/African descent.

372.    Defendants took adverse action against Ramirez, including but not limited to disciplining her and constructively terminating her employment, paying her less than her non-Black employees, and subjecting her to a hostile work environment.

373.    Ramirez's race was a motivating or other causally-sufficient factor in Defendants' actions.

374.    Defendants' actions reflect racial stereotypes, including stereotypes about Black or Brown women, as being subordinate, less capable, and suited for menial tasks like cleaning. Defendants also made racially-tinged statements and comments, including comments about her trustworthiness, her body, and her competence, as set forth in this Complaint. Defendants paid Ramirez less than non-Black employees; these differences in pay cannot be explained by seniority or qualifications, as several other non-Black employees had equal or less seniority, qualifications, and functions, but got paid more than Ramirez.

375.    As a direct and proximate result of Defendants' unlawful actions, Ramirez has been damaged and continues to suffer damages, including but not limited to loss of pay and emotional distress.

376.    Ramirez prays that the Court find Defendants liable for race discrimination in violation of the New York City Human Rights Law, and grant all relief permitted by law, as set forth in the Prayer in this Complaint.

### THIRD CAUSE OF ACTION
### Violation of the New York City Human Rights Law
### N.Y.C. Admin. Code § 8-107 et seq.
### National Origin Discrimination

377.    Ramirez incorporates each and every foregoing and succeeding paragraph of this Complaint as if fully set forth here.

378.    Ramirez is Afro-Latina and is the granddaughter of immigrants from the Dominican Republic.

379.    Defendants took adverse action against Ramirez, including but not limited to disciplining her, constructively terminating her employment, paying her less than employees of a different background, and subjecting her to a hostile work environment.

380.    Ramirez's national origin was a motivating or other causally-sufficient factor in Defendants' actions.

381.    Defendants' actions reflect stereotypes related to her Afro-Latina/Dominican background, including stereotypes about Black or Brown women as being subordinate, less capable, and suited for menial tasks like cleaning.   Defendants also made statements about her hair, nails, body, and being "vocal", and other disparaging comments - which reflects a stereotype of Afro-Latinas and Dominican women as being "too sexual" and "too sassy." Defendants paid Ramirez less than employees of other national origins; these differences in pay cannot be explained by seniority or qualifications, as several other employees of different national origin had equal or less seniority, qualifications, and functions, but got paid more than

Ramirez. The full comments and actions are more fully set forth in other portions of this Complaint.

382. As a direct and proximate result of Defendants' unlawful actions, Ramirez has been damaged and continues to suffer damages, including but not limited to loss of pay and emotional distress.

383. Ramirez prays that the Court find Defendants liable for national origin discrimination in violation of the New York City Human Rights Law, and grant all relief permitted by law, as set forth in the Prayer in this Complaint.

**FOURTH CAUSE OF ACTION**
**Violation of the New York City Human Rights Law**
**N.Y.C. Admin. Code § 8-107 et seq.**
**Color Discrimination**

384. Ramirez incorporates each and every foregoing and succeeding paragraph of this Complaint as if fully set forth here.

385. Ramirez was the darkest-skinned person working at Temin & Company, and the only person with African heritage.

386. Defendants took adverse action against Ramirez, including but not limited to disciplining her, constructively terminating her employment, paying her less than employees of lighter skin color, and subjecting her to a hostile work environment.

387. Ramirez's color was a motivating or other causally-sufficient factor in Defendants' actions.

388. Defendants' actions reflect color-related stereotypes, including stereotypes about Black or Brown women, as being subordinate, less capable, and suited for menial tasks like cleaning. Defendants paid Ramirez less than lighter skinned employees; these differences in

pay cannot be explained by seniority or qualifications, as several other lighter skinned employees had equal or less seniority, qualifications, and functions, but got paid more than Ramirez. Defendants also made other biased statements and comments, including comments about her trustworthiness, her body, and her competence, as set forth in this Complaint.

389.     As a direct and proximate result of Defendants' unlawful actions, Ramirez has been damaged and continues to suffer damages, including but not limited to loss of pay and emotional distress.

390.     Ramirez prays that the Court find Defendants liable for color discrimination in violation of the New York City Human Rights Law, and grant all relief permitted by law, as set forth in the Prayer in this Complaint.

**FIFTH CAUSE OF ACTION**
**Violation of the New York City Human Rights Law**
**N.Y.C. Admin. Code § 8-107 et seq.**
**Disability Discrimination**

391.     Ramirez incorporates each and every foregoing and succeeding paragraph of this Complaint as if fully set forth here.

392.     Ramirez lived with one or more disabilities, including but not necessarily limited to PTSD, ADHD, and gynecological symptoms consistent with endometriosis, severe shellfish allergies, a leg injury, and migraines.  Defendants knew of her disability(ies) or that she had a record of such disabilities, and/or regarded her as being disabled.

393.     Defendants took adverse action against Ramirez, including but not limited to disciplining her, constructively terminating her employment, and subjecting her to a hostile work environment;  further, Defendants failed to provide reasonable accommodations for these disabilities.

394. Ramirez's actual, regarded-as, and/or recorded disability status was a motivating or other causally-sufficient factor in Defendants' actions.

395. As further set forth in this Complaint, Defendants made numerous disparaging comments about Ramirez's disabilities and overtly refused to accommodate them, which all indicate that Defendants held these disabilities against Ramirez.

396. As a direct and proximate result of Defendants' unlawful actions, Ramirez has been damaged and continues to suffer damages, including but not limited to loss of pay and emotional distress.

397. Ramirez prays that the Court find Defendants liable for disability discrimination in violation of the New York City Human Rights Law, and grant all relief permitted by law, as set forth in the Prayer in this Complaint.

**SIXTH CAUSE OF ACTION**
**Violation of the New York City Human Rights Law**
**N.Y.C. Admin. Code § 8-107 et seq.**
**Retaliation**

398. Ramirez incorporates each and every foregoing and succeeding paragraph of this Complaint as if fully set forth here.

399. Ramirez engaged in activity protected by the New York City Human Rights Law, including but not necessarily limited to: stating that she needed to put her health first when confronted about going to a doctor's appointment for symptoms of endometriosis; speaking out against Temin's racist comments about the right kind of diversity being White diversity and about racist comments regarding the musical "In the Heights"; and stating that her work on the #MeToo Index was causing a rise in symptoms related to PTSD.

400.    Defendants took adverse action against Ramirez because of her protected activity. Among other things, when Defendants criticized Ramirez for going to a doctor's appointment instead of personally taking a lamp for fixing, she told Defendants that she needed to put her health first, and Temin yelled more at Ramirez and told her to "take responsibility." Defendants used Ramirez's disabilities to force her out of the workplace, by, among other things, forcing her to vacuum and clean. Defendants also exacerbated Ramirez's migraines after Ramirez emphasized that she needed to keep the lights in her office off that day by forcing Ramirez to keep lights on. Defendant retaliated against Ramirez for having biopsies and needing time off by making her feel as if the time off was a burden for the company, and not allowing her to work from home when other employees who were not Black and not disabled were permitted to work from home.    Defendants knew of and exacerbated her PTSD by acknowledging she was experiencing it and then forcing her to continue working on the #MeToo Index.

401.    Ramirez's protected activity was a motivating or other causally-sufficient factor in Defendants' actions.

402.    Defendants' actions and the background facts indicate a causal connection.    In numerous instances, Temin made critical and retaliatory comments about Ramirez's protected activity immediately in the moment or shortly thereafter.    Further, Ramirez was singled out to not be permitted to work from home, and was singled out for cleaning and other menial tasks. There is a time connection in the hostile work environment:  Defendants increased their abuse of Ramirez after she stood up to discriminatory treatment.  Defendants have not taken such action against employees who did not complain.

403.    As a direct and proximate result of Defendants' unlawful actions, Ramirez has been damaged and continues to suffer damages, including loss of pay and benefits and emotional distress.

404.    Ramirez prays that this Court find Defendants liable for retaliation in violation of the New York City Human Rights Law, and grant all relief permitted by law, as set forth in the Prayer in this Complaint.

**SEVENTH CAUSE OF ACTION**
**Violation of the New York State Human Rights Law**
**N.Y. Exec. Law § 290 et seq.**
**Sex Discrimination**

405.    Ramirez incorporates each and every foregoing and succeeding paragraph of this Complaint as if fully set forth here.

406.    Ramirez is female.

407.    Defendants took adverse action against Ramirez, including but not limited to disciplining her, constructively terminating her employment, and subjecting her to a hostile work environment.

408.    Ramirez's sex was a motivating or other causally-sufficient factor in Defendants' actions.

409.    Defendants' actions reflect gender stereotypes, including stereotypes about Black or Brown women as being subordinate, less capable, and suited for menial tasks like cleaning. Defendants also subjected Plaintiff to stereotyped gender expectations and punished Plaintiff for not conforming to Defendants' stereotypes.

410. As a direct and proximate result of Defendants' unlawful actions, Ramirez has been damaged and continues to suffer damages, including but not limited to loss of pay and emotional distress.

411. Ramirez prays that the Court find Defendants liable for sex discrimination in violation of the New York State Human Rights Law, and grant all relief permitted by law, as set forth in the Prayer in this Complaint.

**EIGHTH CAUSE OF ACTION**
**Violation of the New York State Human Rights Law**
**N.Y. Exec. Law § 290 et seq.**
**Race Discrimination**

412. Ramirez incorporates each and every foregoing and succeeding paragraph of this Complaint as if fully set forth here.

413. Ramirez is of partially Black/African descent.

414. Defendants took adverse action against Ramirez, including but not limited to disciplining her, constructively terminating her employment, paying her less than her non-Black colleagues, and subjecting her to a hostile work environment.

415. Ramirez's race was a motivating or other causally-sufficient factor in Defendants' actions.

416. Defendants' actions reflect racial stereotypes, including stereotypes about Black or Brown women, as being subordinate, less capable, and suited for menial tasks like cleaning. Defendants also made racially-tinged statements and comments. Defendants paid Ramirez less than non-Black employees; these differences in pay cannot be explained by seniority or qualifications, as several other non-Black employees had equal or less seniority, qualifications, and functions, but got paid more than Ramirez.

65

417.    As a direct and proximate result of Defendants' unlawful actions, Ramirez has been damaged and continues to suffer damages, including but not limited to loss of pay and emotional distress.

418.    Ramirez prays that the Court find Defendants liable for race discrimination in violation of the New York State Human Rights Law, and grant all relief permitted by law, as set forth in the Prayer in this Complaint.

### NINTH CAUSE OF ACTION
### Violation of the New York State Human Rights Law
### N.Y. Exec. Law § 290 et seq.
### National Origin Discrimination

419.    Ramirez incorporates each and every foregoing and succeeding paragraph of this Complaint as if fully set forth here.

420.    Ramirez is Afro-Latina and is the granddaughter of immigrants from the Dominican Republic.

421.    Defendants took adverse action against Ramirez, including but not limited to disciplining her, constructively terminating her employment, paying her less than employees of a different background, and subjecting her to a hostile work environment.

422.    Ramirez's national origin was a motivating or other causally-sufficient factor in Defendants' actions.

423.    Defendants' actions reflect stereotypes related to her Afro-Latina/Dominican background, including stereotypes about Black or Brown women as being subordinate, less capable, and suited for menial tasks like cleaning.   Defendants also made statements about her hair, nails, body, and being "vocal", and other disparaging comments, which reflect stereotypes of Afro-Latinas and Dominican women as being "too sexual" and "too sassy."  Defendants paid

Ramirez less than employees of different national origins; these differences in pay cannot be explained by seniority or qualifications, as several other employees of different national origin had equal or less seniority, qualifications, and functions, but got paid more than Ramirez. The full comments and actions are more fully set forth in other portions of this Complaint.

424.     As a direct and proximate result of Defendants' unlawful actions, Ramirez has been damaged and continues to suffer damages, including but not limited to loss of pay and emotional distress.

425.     Ramirez prays that the Court find Defendants liable for national origin discrimination in violation of the New York State Human Rights Law, and grant all relief permitted by law, as set forth in the Prayer in this Complaint.

**TENTH CAUSE OF ACTION**
**Violation of the New York State Human Rights Law**
**N.Y. Exec. Law § 290 et seq.**
**Color Discrimination**

426.     Ramirez incorporates each and every foregoing and succeeding paragraph of this Complaint as if fully set forth here.

427.     Ramirez was the darkest-skinned person working at Temin & Company, and the only person with African heritage.

428.     Defendants took adverse action against Ramirez, including but not limited to disciplining her, constructively terminating her employment, paying her less than employees of lighter skin color, and subjecting her to a hostile work environment.

429.     Ramirez's color was a motivating or other causally-sufficient factor in Defendants' actions.

430.     Defendants' actions reflect color-related stereotypes, including stereotypes about Black or Brown women as being subordinate, less capable, and suited for menial tasks like cleaning.  Defendants paid Ramirez less than lighter skinned employees; these differences in pay cannot be explained by seniority or qualifications, as several other lighter skinned employees had equal or less seniority, qualifications, and functions, but got paid more than Ramirez. Defendants also made other biased statements and comments, including comments about her trustworthiness, her body, and her competence, as set forth in this Complaint.

431.     As a direct and proximate result of Defendants' unlawful actions, Ramirez has been damaged and continues to suffer damages, including but not limited to loss of pay and emotional distress.

432.     Ramirez prays that the Court find Defendants liable for color discrimination in violation of the New York State Human Rights Law, and grant all relief permitted by law, as set forth in the Prayer in this Complaint.

**ELEVENTH CAUSE OF ACTION**
**Violation of the New York State Human Rights Law**
**N.Y. Exec. Law § 290 et seq.**
**Disability Discrimination**

433.     Ramirez incorporates each and every foregoing and succeeding paragraph of this Complaint as if fully set forth here.

434.     Ramirez lived with one or more disabilities, including but not necessarily limited to PTSD, ADHD, and gynecological symptoms consistent with endometriosis, severe shellfish allergies, a leg injury, and migraines.  Defendants knew of her disability(ies) or that she had a record of such disabilities, and/or regarded her as being disabled.

435.     Defendants took adverse action against Ramirez, including but not limited to disciplining her, constructively terminating her employment, and subjecting her to a hostile work environment; further, Defendants failed to provide reasonable accommodations for these disabilities.

436.     Ramirez's actual, regarded-as, and/or recorded disability status was a motivating or other causally-sufficient factor in Defendants' actions.

437.     As further set forth in this Complaint, Defendants made numerous disparaging comments about Ramirez's disabilities and overtly refused to accommodate them, which all indicate that Defendants held these disabilities against Ramirez.

438.     As a direct and proximate result of Defendants' unlawful actions, Ramirez has been damaged and continues to suffer damages, including but not limited to loss of pay and emotional distress.

439.     Ramirez prays that the Court find Defendants liable for disability discrimination in violation of the New York State Human Rights Law, and grant all relief permitted by law, as set forth in the Prayer in this Complaint.

**TWELFTH CAUSE OF ACTION**
**Violation of the New York State Human Rights Law**
**N.Y. Exec. Law § 290 et seq.**
**Retaliation**

440.     Ramirez incorporates each and every foregoing and succeeding paragraph of this Complaint as if fully set forth here.

441.     Ramirez engaged in activity protected by the New York State Human Rights Law, including but not necessarily limited to: stating that she needed to put her health first when confronted about going to a doctor's appointment for symptoms of endometriosis; speaking out

against Temin's racist comments about the right kind of diversity being White diversity and about racist comments regarding the musical "In the Heights"; and stating that her work on the #MeToo Index was causing a rise in symptoms related to PTSD.

442. Defendants took adverse action against Ramirez because of her protected activity. Among other things, when Defendants criticized Ramirez for going to a doctor's appointment instead of personally taking a lamp for fixing, she told Defendants that she needed to put her health first, and Temin yelled more at Ramirez and told her to "take responsibility." Defendants used Ramirez's disabilities to force her out of the workplace, by, among other things, forcing her to vacuum and clean. Defendants also exacerbated Ramirez's migraines after Ramirez emphasized that she needed to keep the lights in her office off that day by forcing Ramirez to keep lights on. Defendant retaliated against Ramirez for having biopsies and needing time off by making her feel as if the time off was a burden for the company, and not allowing her to work from home when other employees who were not Black and not disabled were permitted to work from home. Defendant learned about Ramirez's PTSD arising from her work on the #MeToo Index, and then forced her to work on it, knowing that it would exacerbate her PTSD.

443. Ramirez's protected activity was a motivating or other causally-sufficient factor in Defendants' actions.

444. Defendants' actions and the background facts indicate a causal connection. In numerous instances, Temin made critical and retaliatory comments about Ramirez's protected activity immediately in the moment or shortly thereafter. Further, Ramirez was singled out to not be permitted to work from home, and was singled out for cleaning and other menial tasks. There is a time connection in the hostile work environment: Defendants increased their abuse of

Ramirez after she stood up to discriminatory treatment. Defendants have not taken such action against employees who did not complain.

445. As a direct and proximate result of Defendants' unlawful actions, Ramirez has been damaged and continues to suffer damages, including loss of pay and benefits and emotional distress.

446. Ramirez prays that this Court find Defendants liable for retaliation in violation of the New York State Human Rights Law, and grant all relief permitted by law, as set forth in the Prayer in this Complaint.

## THIRTEENTH CAUSE OF ACTION
### Violation of 42 U.S.C. § 1981
### Race Discrimination

447. Ramirez incorporates each and every foregoing and succeeding paragraph of this Complaint as if fully set forth here.

448. Ramirez is of partially Black/African descent.

449. Defendants took adverse action against Ramirez, including but not limited to disciplining her, constructively terminating her employment, paying her less than her non-Black colleagues, and subjecting her to a hostile work environment.

450. Ramirez's race was a but-for cause of Defendants' actions.

451. Defendants' actions reflect racial stereotypes, including stereotypes about Black or Brown women, as being subordinate, less capable, and suited for menial tasks like cleaning. Defendants also made racially-tinged statements and comments, including comments about her trustworthiness, her body, and her competence, as set forth in this Complaint. Defendants paid Ramirez less than non-Black employees; these differences in pay cannot be explained by

seniority or qualifications, as several other non-Black employees had equal or less seniority, qualifications, and functions, but got paid more than Ramirez.

452.    As a direct and proximate result of Defendants' unlawful actions, Ramirez has been damaged and continues to suffer damages, including but not limited to loss of pay and emotional distress.

453.    Ramirez prays that the Court find Defendants liable for race discrimination in violation of 42 U.S.C. § 1981, and grant all relief permitted by law, as set forth in the Prayer in this Complaint.

**FOURTEENTH CAUSE OF ACTION**
**Violation of 42 U.S.C. § 1981**
**Retaliation**

454.    Ramirez incorporates each and every foregoing and succeeding paragraph of this Complaint as if fully set forth here.

455.    Ramirez engaged in activity protected by 42 U.S.C. § 1981, including but not necessarily limited to speaking out against Temin's racist comments about the right kind of diversity being White diversity and about racist comments regarding the musical "In the Heights."

456.    Defendants took adverse action against Ramirez because of her protected activity in a manner that indicates a but-for causal connection.  Among other things, Ramirez was singled out to not be permitted to work from home, and was singled out for cleaning and other menial tasks. Defendants increased their abuse of Ramirez after she stood up to discriminatory treatment.  Defendants have not taken such action against employees who did not complain. This retaliatory treatment ultimately resulted in Ramirez's constructive discharge.

457.     As a direct and proximate result of Defendants' unlawful actions, Ramirez has been damaged and continues to suffer damages, including loss of pay and benefits and emotional distress.

458.     Ramirez prays that this Court find Defendants liable for retaliation in violation of 42 U.S.C. § 1981, and grant all relief permitted by law, as set forth in the Prayer in this Complaint.

**FIFTEENTH CAUSE OF ACTION**
**Violation of the New York Labor Law**
**Unpaid Minimum and Overtime Wages**

459.     Ramirez incorporates each and every foregoing and succeeding paragraph of this Complaint as if fully set forth here.

460.     The New York Labor Law provides for substantive overtime pay at a rate of one and one-half times the base rate of pay for all hours worked over forty in a given week. *See* N.Y. Labor Law ("NYLL") §§ 2, 651, 663(1); N.Y. Comp. Codes R. & Regs. tit. 12, § 142-2.2. The Labor Law also provided for minimum wages at the rate of $10.50 per hour in 2017, during the period of Ramirez's "internship."[15]

461.     Defendants were employers within the meaning of the New York Labor Law.

462.     Ramirez was an employee within the meaning of the New York Labor Law.

463.     Defendants suffered and/or permitted Ramirez to perform work to their benefit, including work in excess of forty (40) hours per week.

464.     Defendants failed to compensate Ramirez for all time worked in excess of forty hours per week at a rate of one and one-half times the regular rate at which Ramirez was

---

[15] https://www.labor.ny.gov/workerprotection/laborstandards/workprot/minwage.shtm

employed, and during the "internship," compensated her at a rate so low that she did not even earn minimum wage.

465.    Defendants' actions were willful; among other things, when confronted with a question about overtime, Temin bluntly declared that she does not pay overtime - indicating that she knows of an obligation to pay but simply refuses to.

466.    As a result of Defendants' violations of the New York Labor Law, Ramirez has suffered damages by being denied minimum and overtime wages in accordance with the NYLL in amounts to be determined at trial, and is entitled to recovery of all such amounts, as well as liquidated damages, pre-judgment interest, post-judgment interest, attorneys' fees, costs, and other compensation, pursuant to N.Y. Labor Law §§ 2, 651, 663 and N.Y. Comp. Codes R. & Regs. tit. 12, § 142-2.2.

467.    Ramirez prays that this Court find Defendants liable for violation of the New York Labor Law, and grant all relief permitted by law, as set forth in the Prayer in this Complaint.

## SIXTEENTH CAUSE OF ACTION
### Battery

468.    Ramirez incorporates each and every foregoing and succeeding paragraph of this Complaint as if fully set forth here.

469.    Defendant Temin used her hand to make bodily contact with Ramirez's hand as Ramirez was carrying hot coffee.

470.    Plaintiff Ramirez did not consent to the touch.

471.    The touch was offensive and injured Plaintiff Ramirez both because Defendant Temin hit her, and because the result of the hitting was that hot coffee spilled on Ramirez and

scalded her arm. Plaintiff Ramirez suffered emotional and physical distress and had to leave the office. This is bodily contact a reasonable person would find offensive.

472.    Defendant Temin evinced her intent through her facial expression, her lack of care after she hit Plaintiff Ramirez, by continuing with her phone call as if nothing had happened and ignoring Plaintiff Ramirez, and by failing to ask Plaintiff Ramirez if she was alright after watching hot coffee spill on her. Defendant Temin also evinced her intent by telling Ramirez, when Ramirez later confronted her, that Ramirez should apologize to her.

473.    Plaintiff Kaitlyn Ramirez suffered physical and emotional distress as a result of Defendants' actions.

474.    Ramirez prays that this Court find Defendants liable for battery, and grant all relief permitted by law, as set forth in the Prayer in this Complaint.

## SEVENTEENTH CAUSE OF ACTION
### Intentional Infliction of Emotional Distress

475.    Ramirez incorporates each and every foregoing and succeeding paragraph of this Complaint as if fully set forth here.

476.    Defendants engaged in extreme and outrageous conduct by, among other things, creating a hostile work environment using abuse to force Ramirez to quit her employment and by hitting Ramirez and spilling coffee on her intentionally, and by forcing Ramirez to work on a project that increased her PTSD even after learning that Ramirez was suffering from PTSD from the work and acknowledging Ramierz's PTSD.

477.    Defendants expressed the intent to cause severe emotional distress by having conversations about forcing Ramirez out, and by thanking Cao for forcing Ramirez to quit, and by hitting Ramirez and later telling her that she should apologize, and by telling Ramirez that she

would have fired her if she did not continue to work on the #MeToo Index despite her acknowledged PTSD arising from the work, among other acts.

478. There is a causal connection between the conduct and Ramirez's emotional distress.

479. Ramirez's emotional distress is severe and has required counseling and medication, and has resulted in physical distress as well; Ramirez suffers from this emotional distress to present.

480. Defendants conduct, from policing Ramirez's body, to hitting her, to forcing her to clean when she was injured, to purposely paying her substandard wages to force her to quit, to exacerbating her acknowledged PTSD by forcing her to continue work that was causing it, and other conduct as set forth in this Complaint, is so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.

481. Ramirez prays that this Court find Defendants liable for intentional infliction of emotional distress, and grant all relief permitted by law, as set forth in the Prayer in this Complaint.

## JURY DEMAND

Plaintiff Kaitlyn Ramirez respectfully demands a jury trial on all issues so triable. *See* U.S. Const. amend. VII; Fed. R. Civ. P. 38.

## PRAYER FOR RELIEF

Plaintiff Kaitlyn Ramirez prays that this Court enter judgment in her favor, and grant all relief allowed under law, including but not limited to:

A.    Actual economic damages, including lost wages and benefits, adjusted for promotional opportunities lost;

B.    Actual non-economic damages, including damages for emotional distress;

C.    Unpaid wages and liquidated damages;

D.    Punitive damages and civil penalties;

E.    Attorney's fees, expert fees, and costs;

F.    Backpay, frontpay, and other equitable relief;

G.    An order that Defendants cease and desist from all discriminatory and retaliatory practices and revise Ramirez's personnel records to remove all negative references;

H.    Adjustment of any monetary sum awarded for the adverse tax consequences of receiving it in a lump sum; and

I.    Any other and/or further relief permitted by law.

Dated: August 7, 2020                    Respectfully submitted,
New York, New York
                                         KEENAN & BHATIA, LLC

                                         By: _/s/ E.E. Keenan_____
                                         Edward (E.E.) Keenan
                                         90 Broad Street, Suite 200
                                         New York, NY  10004
                                         Tel:  (917) 975-5278
                                         ee@keenanfirm.com

                                         *Attorney for Plaintiff Kaitlyn Ramirez*