UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

KAITLYN RAMIREZ,

                              Plaintiff,

            – against –

TEMIN & COMPANY, INC. and
DAVIA TEMIN,

                              Defendants.

**OPINION & ORDER**

20 Civ. 6258 (ER)

Ramos, D.J.:

        Kaitlyn Ramirez brings this action against Temin & Company (the "Firm") and its owner

Davia Temin, alleging violations of 42 U.S.C. § 1981, the New York State Human Rights Law,

the New York City Human Rights Law, New York Labor Law, and New York common law.

Before the Court is Defendants' motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6).  For the

reasons discussed, the motion is GRANTED in part and DENIED in part.

## I.      BACKGROUND

        Ramirez is an Afro-Latina woman who attended Swarthmore College and applied for the

college's externship program during her final year.  Doc. 1 ¶¶ 11, 15, 18.  Through the program's

lottery-based matching system, Ramirez was matched with the Firm, a crisis management firm

which focuses on "cybersecurity, sexual harassment, and securities-related crisis management."

*Id.* at ¶¶ 25, 32.  On January 13, 2017, upon completing the week-long externship program,

Ramirez was invited by Temin to join the Firm after she graduated.  *Id*. ¶ 42.  After graduating,

Ramirez returned to the Firm on June 5, 2017 for a ten-week internship.  *Id*. ¶ 45.  Ramirez

received a $5,000 stipend in return for working fifty to sixty hours a week for ten weeks.  *Id*. ¶¶

45-53.  On August 11, 2017, Temin extended the internship by thirteen weeks and agreed to pay

Ramirez a $6,500 stipend for those weeks.  *Id*. ¶¶ 56-58.

On November 11, 2017, the internship ended, and Temin offered Ramirez a permanent

position as a Research Assistant with a salary of $30,000 a year.  *Id*. ¶¶ 61-64.  Ramirez did not

receive an employment contract, but was placed on the payroll and was given the Firm's

Turnkey Document (the "Document"), an office procedural manual.  *Id*. ¶¶ 65-68.  Upon

learning of a new law purportedly mandating a minimum salary of $50,000 per year for any

salaried employee, Temin altered Ramirez's pay structure, such that Ramirez became an hourly

employee, and Temin informed her that she could not be paid more than $30,000 per year.  *Id*. ¶¶

71-75.  Notwithstanding her transition to an hourly employee, Ramirez was still required to work

in excess of 40 hours per week.  *Id*. ¶¶ 79, 87.  According to Ramirez, Defendants failed to pay

her for all of the hours she worked.  *Id*. ¶ 87.  Moreover, she alleges that Temin's finances and

expenditures suggest she is able to pay Ramirez as a salaried employee.  *Id*. ¶ 75.

Ramirez also alleges that she was subject to workplace harassment and discrimination,

describing instances when she was required to work late and other times when Temin would take

up her time by telling Ramirez about "personal matters," including "problems at home" and

"sexual harassment and assault."  *Id*. ¶¶ 83-84.  Ramirez alleges she put off other work to

"minister to Temin's emotional needs."  *Id*. ¶ 83.  After these conversations, Temin would

request that Ramirez perform difficult research tasks or would berate her for unfinished work.

*Id*. ¶¶ 84-86.

Ramirez further alleges that she was paid less than another research assistant, Galina

Fendikevich, who is white.  *Id*. ¶¶ 90-93.  Fendikevich was hired as a research assistant in 2016

and was paid $18.00 per hour, while Ramirez was paid $14.50 per hour.  *Id*. ¶ 93.  In November

2

2017, Temin promoted Fendikevich to Marketing and Editorial Assistant and raised her hourly wage to $22.00 per hour.  *Id.* ¶ 94.  Fendikevich, who was an independent contractor, resigned in July 2018.  *Id.* ¶¶ 95-97.  Ramirez also alleges that she was not paid for remote work, while the three members of the Firm's executive team typically worked remotely and were paid for that work.  *Id.* ¶¶ 99-102.

In early 2018, Temin began requiring twice-daily activity reports from her employees.  *Id.* ¶ 126.  After some time, all employees "fell out of the habit of sending these reports to Temin."  *Id.* ¶ 127.  Ramirez alleges that while Temin stopped asking all other employees (including new hires) for their activity reports, Temin consistently asked Ramirez to submit her reports.  *Id.*  Ramirez alleges that, beginning in 2018, she was excluded from Firm events and meetings, weekly calls, and the annual client award dinner.  *Id.* ¶ 112-127.  Ramirez further alleges that Temin introduced guests and visitors to every employee except Ramirez.  *Id.* ¶ 131.

By July 2018, Temin moved Ramirez to a desk at the front of the office, where she began to feel "watched."  *Id.* ¶¶ 128-129.  Ramirez alleges that the Firm required her to perform menial tasks such as getting food and coffee, cleaning up around the office, and conducting repairs.  *Id.* ¶ 133.  Ramirez was also required to perform personal tasks for Temin such as serving her coffee, tidying her office, removing and cleaning her used mugs and dishes, and turning on the lamps in her office.  *Id.* ¶¶ 134-138.  Ramirez alleges that she was asked to perform these tasks because Temin operated on the racial stereotype that Black women are "housekeepers."  *Id.* ¶ 142.  Ramirez notes that she was the only Black employee during her tenure at the Firm.  *Id.* ¶

108.   As Ramirez acknowledges, these tasks (including dish removal, office tidying, coffee service) are set out in the Firm's office manual.[1]  *Id.* ¶¶ 132-137.

Further, Ramirez recounts instances where Temin made sexually harassing and racially discriminatory comments about her appearance.  *Id*. ¶¶ 148-95.  Ramirez alleges that Temin (1) insinuated that Ramirez and other women who wear red nail polish are unintelligent and unsophisticated, and achieve success through flirtation, (2) told Ramirez that she sounded "angry" when speaking on the phone, (3) made several comments about Ramirez's hair and offered Ramirez hair products that were marketed as being for Black women (on the assumption that Ramirez could use these products "simply because she was Black"), and (4) told Ramirez that her hoop earrings and "bold" lipstick were unprofessional.  *Id*. ¶¶ 149-155, 161-162, 183.  Ramirez notes that when lighter-skinned employees wore similarly-colored lipstick (in deep reds), Temin did not criticize them.  *Id*. ¶ 162.  Ramirez alleges that Temin complained to her that a client's curly hair was "messy" and made comments to a prospective employee that her boyfriend's dreadlocks were unprofessional.  *Id*. ¶¶ 177, 180.  Ramirez alleges that, in commenting on her curly hair, "angry" voice, and red nails and "bold" lip color, Temin relied on racial and gendered stereotypes.  *Id*. ¶¶ 187-190.  Ramirez further alleges that the Firm encouraged her to purchase shapewear and wear a corset to work, though Ramirez does not specify who made these suggestions.  *Id*. ¶¶ 156-157.

---

[1] The manual sets out instructions (for all employees) on "Keeping the Office Clean."  Doc. 1-2 at 61.  The manual informs employees that the "office should be kept pristine," and should "look clean and professional at all times." *Id*.  The manual includes "[s]ome examples of the types of things to look out for:"  "Front table is organized/tidied," "[a]ll lights are on," "dust surfaces periodically," "vacuum regularly," and "check for dust," "Windex glass surfaces," "[u]se Pledge on wood surfaces," "[w]ash dishes and store away as appropriate, "[c]heck Davia's bathroom periodically to make sure she has . . . soap, toilet paper, wet ones, Kleenex tissues, etc.," keep "file room . . . clean and organized."  *Id*. at 61-2.  The manual makes clear that "[k]eeping the office clean is a group effort, and we all do our part to make certain that everything is in immaculate condition."  *Id*.

Ramirez alleges that Temin made offensive comments about other people of color.  *Id.* ¶¶ 171-175, 191-192.  In particular, Ramirez alleges Temin "constantly told clients that she hated Congresswoman Alexandria Ocasio-Cortez," but did not comment on other politicians who share Ocasio-Cortez's views.  *Id.* ¶ 191.  Ramirez alleges Temin's focus on Ocasio-Cortez was race-based.  *Id.*  Ramirez also alleges that Temin told her and other employees that she did not like Valerie Smith, the President of Swarthmore College, who is Black.  *Id.* ¶ 192.  Ramirez alleges Temin's dislike of Smith is founded on racial stereotypes.  *Id.*  Beyond these, Ramirez alleges Temin told her and other employees that "intersectional" is her "least favorite word," and, in a conversation on Washington Heights and the musical "In the Heights," Temin suggested that "the right kind of diversity" included more white people, not more people of color.  *Id.* ¶¶ 165-166, 171-175.  Later in the conversation, Ramirez suggested that an increased white presence in Washington Heights is "most likely due to gentrification."  *Id.*, ¶ 175.  Ramirez alleges Temin "scoffed" at this comment.  *Id.*

Ramirez also alleges that Temin "expected [her employees] to put their work before anything else, including their physical and mental health."  *Id.* ¶ 198.  On January 11, 2018, Ramirez had an exploratory laparoscopy to diagnose possible endometriosis.  *Id.* ¶ 199.  Ramirez's surgeon told her she would need at least a full week off from work, but recommended that she take two weeks off.  *Id.* ¶ 200.  Ramirez requested to work from home, as the Firm allowed her only five sick days, but Temin told Ramirez she would have to use her sick days for that week.  *Id.* ¶¶ 201-202.  Ramirez also alleges that although she suffers from migraines, Temin was "rarely sympathetic" and would instruct Ramirez to run errands and do other "physical office housework" and tell Ramirez to work with the lights on in her office, despite her migraine and associated light sensitivity.  *Id.* ¶¶ 214-218.  On July 10, 2018, Ramirez came to

work wearing a medical boot. *Id*. ¶ 226.  Ramirez alleges that Temin told her to vacuum the office and "do other physically demanding work," despite Ramirez's injury.  *Id*. ¶ 227.  In addition, Ramirez alleges Temin tasked her with dusting, despite Ramirez's dust allergy.  *Id*. ¶¶ 228-229.  After dusting, Ramirez "would end up wheezing, with hives on her face . . .".  *Id*. ¶ 229.  On June 3, 2019, Ramirez had a doctor's appointment, which she had scheduled after an anaphylactic reaction to shellfish.  *Id*. ¶ 204.  That day, Temin asked Ramirez to take one of her lamps to be repaired.  *Id*.  Temin's driver offered to take the lamp instead, and Ramirez attended her appointment.  *Id*. ¶ 207.  Upon learning that her driver had completed the task she had assigned to Ramirez, Temin "became extremely angry," and, according to Ramirez, told her that "work comes first!".  *Id*. ¶¶ 208-211.

 Ramirez alleges that Temin filmed employees and clients with a camera hidden in the back of her office, and that she instructed employees to record all client calls and conversations (without client knowledge or consent).  *Id*. ¶¶ 268-282.  Ramirez argues these audio and video recordings contributed to a culture of "surveillance" and "intimidation" at the Firm.  *Id*. ¶¶ 268, 285.  In addition, Ramirez alleges the Firm instructed a lawyer to threaten former employees with non-disclosure agreements, after a negative review of the Firm appeared on an employment reporting website.  *Id*. ¶¶ 286-287.

Ramirez also alleges that on August 7, 2019, when she brought Temin coffee, Temin "smacked Ramirez's hand, causing Ramirez to spill the scalding coffee . . .".  *Id*. ¶¶ 296-298.  After Temin hit her hand, Ramirez alleges she told her "That was not okay. You hit me.  That is an assault."  *Id.* ¶ 301.  Ramirez notes this act of "physical aggression" was "not isolated" and that Temin often grew angry at and berated her employees, and in one instance threatened to throw a paper shredder.  *Id*. ¶¶ 303-313.

While at the Firm, Ramirez spent most of her time working on the Temin #MeToo Index (the "Index"), a database cataloguing "all high-profile people who have been accused of [sexual] misconduct since December 2015 . . ." *Id.* ¶¶ 244-247.  In the fall of 2019, the "constant exposure to stories of sexual assault" began to affect Ramirez's mental and physical health, and she asked Temin if she could take a one-week break from working on the Index.  *Id.* ¶¶ 314-315. Ramirez told Temin that prior experiences had caused symptoms of post-traumatic stress disorder, and these were triggered by her work on the Index.  *Id.* ¶ 318.  Temin told her that she would remove Ramirez from the project for some time.  *Id.* ¶ 320.   But the next day, Ramirez alleges, Temin ordered Ramirez to work on the Index.  *Id.* ¶ 321.   About a month later, Ramirez alleges, Temin told her that if she had refused to continue working on the Index, Temin would have fired her.  *Id.* ¶ 322.  In September 2019, Temin assigned a new employee to assist Ramirez with the Index.  *Id.* ¶ 323.  Ramirez alleges Temin directed the new employee to ask Chief Operating Officer Rachel Clarke any Index-related questions, as "[Ramirez] knows nothing about the project."  *Id.* ¶ 327.  Upon learning about this conversation, Ramirez felt "gutted," as she had "put in many hours (more than forty per week) working on [the Index] . . .".  *Id.* ¶ 328.

That month, Ramirez and the other employee began to prepare for an upcoming sexual harassment training for a client.  *Id.* ¶ 329.  Temin gave Ramirez a list of the client's questions, including requests for "specific statistics and numbers."  *Id.* ¶¶ 330-332.  When Ramirez told Temin that she "did not have the data she needed to answer some of the client's questions," Temin told her to "just estimate," and "fudge" the numbers; Ramirez refused.  *Id.* ¶¶ 332-334. Ramirez alleges Temin then "yelled at [her] for not having the data."  *Id.* ¶ 337.

As Ramirez and the other employee prepared throughout the month, Amy Cao, Manager of Marketing and Business Development, supervised their work.  *Id.* ¶¶ 341-346.   According to

Ramirez, Cao asked for new drafts every few hours and came into the office every thirty to sixty minutes to ask for updates. *Id.* ¶ 341.  Ramirez alleges Cao sent extensive edits late at night and expected updated drafts with edits integrated the following morning. *Id.* ¶ 342.  On the morning of September 20, 2019, after reviewing Ramirez's work and comparing it with the work of the other employee assigned to the Index, Cao told Ramirez that she was "disappointed" in her and removed Ramirez from the project. *Id.* ¶¶ 343-346.  Ramirez, having "worked on this project almost day in and day out" felt "shocked," "betrayed," and "humiliated." *Id.* ¶ 347.  Later that day, Ramirez submitted her letter of resignation to Temin. *Id.* ¶ 349.

Ramirez alleges that Temin had determined early on during her tenure at the Firm that she wanted to fire her, but did not "because . . . 'it would look bad. . . '". *Id.* ¶ 351.  Ramirez further alleges that, rather than fire her, Temin told Beilin Ye, Ramirez's supervisor, that she "was aiming to force Ramirez to quit by not giving her promotions or raises, hiring people above her, and 'paying her so little it's criminal.'" *Id.* ¶ 352.  According to Ramirez, Temin made Ramirez clean the office and work on the Index as a means of pushing Ramirez to quit. *Id.* ¶ 353.

Ramirez alleges that during her two years at the Firm, she developed acid reflux, stomach aches, and nausea, often had anxiety attacks and nightmares, experienced frequent insomnia, developed migraines several times a week, and began to drink more frequently. *Id.* ¶ 360.

In addition, Ramirez notes she incurred credit card debt because her necessary expenses exceeded her salary, and felt at times that "she could not leave her job." *Id.* ¶ 360.  Ramirez felt "exhausted," "hopeless," and "like she had no way out." *Id.*  Ramirez alleges Temin "caused [her] to lose her self-esteem and self-assurance," and that her therapist and psychiatrist told her to quit. *Id.*

On August 7, 2020, Ramirez filed her complaint.  Defendants moved to dismiss the complaint on October 21, 2020.

## II.    LEGAL STANDARD

When ruling on a motion to dismiss pursuant to Rule 12(b)(6), district courts are required to accept as true all factual allegations in the complaint and to draw all reasonable inferences in the plaintiff's favor.  *Walker v. Schult*, 717 F.3d 119, 124 (2d Cir. 2013).  However, this requirement does not apply to legal conclusions, bare assertions, or conclusory allegations. *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 681 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  In order to satisfy the pleading standard set forth in Rule 8, a complaint must contain sufficient factual matter to state a claim for relief that is plausible on its face.  *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 570).  Accordingly, a plaintiff is required to support his claims with sufficient factual allegations to show "more than a sheer possibility that a defendant has acted unlawfully."  *Id*.  Even though "a discrimination complaint need not allege facts establishing each element of a *prima facie* case of discrimination" to survive a motion to dismiss, "it must at a minimum assert nonconclusory factual matter sufficient to nudge its claims across the line from conceivable to plausible." *E.E.O.C. v. Port Auth. of N.Y. & N.J.*, 768 F.3d 247, 254 (2d Cir. 2014) (quoting *Iqbal*, 556 U.S. at 680) (internal alternations omitted).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556).

## III.    DISCUSSION

### A.  § 1981 Claims

Ramirez alleges that, in violation of 42 U.S.C. § 1981, Defendants discriminated against her based on her race and retaliated against her for her participation in protected activity, namely "speaking out" against Temin's comments on diversity.  Doc. 1, ¶ 455.

### 1. Discrimination

Ramirez's discrimination and retaliation claims under § 1981 are analyzed under the three-step burden-shifting framework set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  See *Littlejohn v. City of New York*, 795 F.3d 297, 307 (2d Cir. 2015) (applying *McDonnell* framework to § 1981 claims).  Under the *McDonnell* framework, a plaintiff first must establish a *prima facie* case of discrimination.  *McDonnell*, 411 U.S. at 802.  Once the plaintiff establishes a *prima facie* case, the burden shifts to the defendant to offer a legitimate, nondiscriminatory reason for its actions.  *Id.* at 802-03.  If the defendant satisfies its burden, the burden shifts back to the plaintiff to demonstrate that the proffered reason is pretextual.  *Id.* at 804.  Ultimately, the plaintiff will be required to prove that the defendant acted with discriminatory motivation.  *See Littlejohn*, 795 F.3d at 307.  At the pleading stage, however, the facts alleged must merely "give plausible support to the reduced requirements that arise under *McDonnell Douglas* in the initial phase of . . . litigation." *Id.* at 311.  Thus, the question on a motion to dismiss is whether the plaintiff has adequately pleaded a *prima facie* case.

To establish a *prima facie* case of discrimination under § 1981, a plaintiff must show that (1) she belonged to a protected class, (2) she was qualified for the position, (3) she suffered an adverse employment action, and (4) the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent.  *See Terry v. Ashcroft*, 336 F.3d 128, 137-38 (2d. Cir. 2003).  Although a plaintiff is not required to plead facts proving each

element of a *prima facie* case of discrimination at the pleading stage, her allegations must provide "plausible support" for a "minimal inference" that the employer was motivated by discriminatory intent." *Littlejohn*, 795 F.3d at 311.  Further, those allegations must be fact-specific.  *See Grimes v. Fremont General Corp.*, 785 F. Supp. 2d 269, 296 (S.D.N.Y. 2011).  Conclusory or naked allegations will not do.  *See id*.

Ramirez satisfies the first two elements.  First, Ramirez is an Afro-Latina woman.  Doc. 1 ¶ 11.  Second, Defendants invited Ramirez to return to the Firm for an internship after she completed a term-time externship program and offered her a permanent position after the completion of her internship; Ramirez worked for Defendants for over two years, and Defendants do not dispute that Ramirez was qualified for her position.  *Id*. at ¶¶ 18, 25, 42, 64.

Ramirez's discrimination claim, however, fails upon reaching the third element, as she fails to properly allege an adverse employment action under § 1981.  An adverse employment action is a "materially adverse change in the terms and conditions of employment."  *Galabya v. N.Y. City Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000) (internal quotation marks omitted).  To be materially adverse, a change in working conditions must be "more disruptive than a mere inconvenience or an alteration of job responsibilities." *Kassner v. 2nd Ave. Delicatessen Inc.*, 496 F.3d 229, 238 (2d Cir. 2007) (citing *Galabya*, 202 F.3d at 640).  A materially adverse change may be indicated by "a termination of employment; a demotion with a decrease in wage or salary or a less distinguished title; a material loss of benefits; significantly diminished material responsibilities; or other indices unique to a particular situation."  *Borrero v. Am. Exp. Bank Ltd.*, 533 F. Supp. 2d 429, 436 (S.D.N.Y. 2008).

In the instant case, Ramirez alleges Defendants took adverse action against her by paying her less than her non-Black colleagues, subjecting her to a hostile work environment, and

constructively terminating her employment.  Doc. 1, ¶ 449.  Ramirez further alleges these actions
"reflect racial stereotypes, including stereotypes about Black or Brown women, as being
subordinate, less capable, and suited for menial tasks like cleaning."  *Id*. ¶ 451.

### 1.   Disparate Pay

First, Ramirez argues Defendants took adverse action against her by paying her less than
non-Black employees.  Doc. 1, ¶ 449.  When a plaintiff seeks to establish a *prima facie* case
of disparate pay, she must show: (1) that she was a member of a protected class; (2) that she was
paid less than similarly situated non-members of her protected class; and (3) evidence of
discriminatory animus.  *Kearney v. ABN AMRO, Inc.*, 738 F. Supp. 2d 419, 426 (S.D.N.Y. 2010)
(citing *Thomas v. iStar Financial, Inc.*, 438 F. Supp. 2d 348, 367 (S.D.N.Y. 2006)).  It is not
contested that Ramirez is a member of a protected class.  However, Ramirez does not allege facts
showing she was paid less than similarly situated employees.

When a plaintiff seeks to meet her *prima facie* case by reference to the disparate
treatment of an allegedly similarly situated employee, "the plaintiff must show that she shared
sufficient employment characteristics with that comparator so that they could be
considered similarly situated."  *McGuinness v. Lincoln Hall*, 263 F.3d 49, 53 (2d Cir. 2001).  A
plaintiff need not show that a comparator was an "*identically* situated employee," just that she
was "similarly situated in all *material* respects."  *Id.* at 53-4 (quoting *Shumway v. United Parcel
Service*, 118 F.3d 60, 64 (2d Cir. 1997)) (emphasis in original).  Further, such employee "must
have a situation sufficiently similar to plaintiff's to support at least a minimal inference that the
difference of treatment may be attributable to discrimination."  *Kearney*, 738 F. Supp. 2d. at 426
(quoting *McGuinness*, 263 F. 3d at 54) (internal quotation marks omitted).  Employment
characteristics which can support a finding that two employees are "similarly situated" include

"similarities in education, seniority, performance, and specific work duties," *DeJesus v. Starr Technical Risks Agency, Inc.*, 03 Civ. 1298 (RJH), 2004 WL 2181403, at *9 (S.D.N.Y. Sept. 27, 2004), and similar requirements for skill, effort, and responsibility for jobs performed "under similar working conditions."  *DeJohn v. Wal-Mart Stores E., LP*, 09 Civ. 01315 (GTS), 2013 WL 1180863, at *6 (N.D.N.Y. Mar. 20, 2013).

In her complaint, Ramirez alleges she was paid less than Galina Fendikevich, a Research Assistant at the Firm.  Doc. 1 ¶¶ 90-93.  Ramirez notes Fendikevich is white.  *Id.* ¶ 92.  Ramirez alleges she was paid $14.50 an hour for her work as a Research Assistant, while Fendikevich was paid $18.00 an hour.  *Id.* ¶ 93.  While Ramirez alleges she and Fendikevich shared the same title, other facts in the complaint show that Fendikevich was hired a year prior to Ramirez and was promoted to Marketing and Editorial Assistant at about the time that Ramirez was hired full time. *Id.* ¶ 91-94.  Moreover, Ramirez does not in any of her pleadings set out Fendikevich's employment characteristics, including her performance, work duties, experience, skill, or working conditions.  Ramirez does not provide facts alleging she and Fendikevich were similarly situated in any material respect other than they shared the same title when Ramirez worked as an intern.  In other words, Ramirez cannot show that she shared sufficient employment characteristics with Fendikevich.  In fact, as Ramirez acknowledges, Fendikevich was not even an employee, but rather an independent contractor.  Without more, Ramirez cannot show that she was paid less than a similarly situated employee.

In her opposition to Defendants' motion to dismiss, Ramirez alleges for the first time that she was paid less than a second similarly situated employee, an "unnamed" South Asian employee, who received a starting salary of $53,000 per year.  Doc. 51 at 19.  While the Court is not obligated to consider this information as it is not included in the complaint, it is apparent that

13

the unnamed employee is not similarly situated.  For example, Ramirez alleges this employee is

"junior," but she provides no other facts related to this employee's employment.  *Id*.  Ramirez

does provide this employee's title, working conditions, or responsibilities.  As is the case with

Ramirez's allegations related to Fendikevich, these allegations include no information about the

unnamed employee's day-to-day tasks and responsibilities.  As such, Ramierz cannot show that

Fendikevich or the unnamed employee is a similarly situated employee, and her disparate pay

claim must fail.

### 2.   Hostile Work Environment

Second, Ramirez argues Defendants took adverse action against her by subjecting her to a

hostile work environment.  To state a hostile work environment claim, a plaintiff must allege that

the harassment she experienced was "sufficiently severe or pervasive to alter the conditions of

[her] employment and create an abusive working environment," and that a specific basis exists

on which to impute that conduct to the employer.  *Alfano v. Costello*, 294 F.3d 365, 373 (2d Cir.

2002) (internal quotation marks and citations omitted).  In particular, a plaintiff must show that

the "workplace was so severely permeated with discriminatory intimidation, ridicule, and insult

that the terms and conditions of her employment were thereby altered."  *Id.* (citations omitted).

In determining whether a plaintiff has met this burden, courts should "examin[e] the

totality of the circumstances, including:  the frequency of the discriminatory conduct; its

severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and

whether it unreasonably interferes with the victim's [job] performance." *Hayut v. State Univ. of

N.Y.*, 352 F.3d 733, 745 (2d Cir. 2003) (internal quotation marks omitted).  "[W]hether an

environment is 'hostile' or 'abusive' can be determined only by looking at all the

14

circumstances." *Harris v. Forklift Systems*, Inc., 510 U.S. 17, 23 (1993).  Isolated incidents of

harassment, unless sufficiently "severe," usually will not suffice to establish a hostile work

environment.  *See, e.g., Pucino v. Verizon Commc'ns*, 618 F.3d 112, 119 (2d Cir. 2010); *Kaytor

v. Elec. Boat Corp.*, 609 F.3d 537, 547 (2d Cir. 2010); *Howley v. Town of Stratford*, 217 F.3d

141, 153 (2d Cir. 2000).  Incidents must be "sufficiently continuous and concerted in order to be

deemed pervasive."  *Perry v. Ethan Allen, Inc.*, 115 F.3d 143, 149 (2d Cir. 1997) (internal

quotation marks and citations omitted).

Here, in support of her hostile work environment claim under § 1981, Ramirez argues

Temin belittled her by ordering her to perform menial tasks, yelled at her for failure to complete

these tasks, and, in one instance, "smacked Ramirez's hand," as she was carrying a cup of coffee.

Doc. 1 ¶¶ 133, 141, 296-302.  In particular, Ramirez alleges Temin instructed her to dust

surfaces, tidy the office, "fetch food and coffee, wipe down tables, vacuum floors, wash dishes,

and repair the lamps in the office," and "yelled at Ramirez if she did not clean up the garbage in

Temin's office or if she had not washed the dishes from the previous day."  *Id.* ¶¶ 133-134, 141.

Ramirez argues "[a]ny reasonable employee would regard this controlling and physically and

psychologically abusive environment as hostile."  Doc. 51 at 16.

Defendants argue Ramirez does not state a claim for hostile work environment under §

1981, and the Court agrees.  Defendants contend Ramirez experienced "at best 'petty slights and

trivial inconveniences.'" Doc. 34 at 15 (citing *Mihalik v. Credit Agricole Cheuvreux North

America, Inc.*, 715 F.3d 102, 108-09 (2d Cir. 2013)).  Considering the totality of Ramirez's

allegations under § 1981—the assignment of menial tasks, discipline for failure to complete

certain of those tasks, and the incident with the coffee cup—the Court finds that these incidents,

taken together, do not "meet the threshold of severity or pervasiveness required for a hostile

work environment claim." *Alfano*, 294 F.3d at 376, 380 (vacating award for hostile work environment because the "humiliating" and "plainly offensive" incidents were "too few, too separate in time, and too mild . . . to create an abusive working environment," and because no incident was "of such severity and character as to itself subvert the plaintiff's ability to function in the workplace"); *Fleming v. MaxMara USA, Inc.*, 371 F.App'x. 115, 119 (2d Cir. 2010) (finding no hostile work environment where "defendants . . . excessively criticized [plaintiff's] work, . . . arbitrarily imposed duties outside of her responsibilities, threw books, and sent rude emails to her"); *see also Davis-Molina v. Port Auth. of N.Y. & N.J.*, No. 08 Civ. 7586 (GBD), 2011 WL 4000997, at *11 (S.D.N.Y., Aug. 19, 2011) (finding that "diminished [job] responsibilities" "yell[ing] and "talk[ing] down to," and an increased workload of menial tasks were insufficient to show that defendant's conduct was sufficiently severe or pervasive), *aff'd*, 488 F.App'x. 530 (2d Cir. 2012).

Here, as in *Fleming*, excessive criticism and rudeness do not constitute a hostile work environment, and isolated incidents of harassment—like the incident with the coffee cup— typically are insufficient to establish a hostile work environment. *See, e.g.*, *Perry*, 115 F.3d at 149. In addition, here, as was the case in *Davis-Molina*, the assignment of menial tasks, including tidying and errands, does not create an environment so severe or pervasive as to have altered the conditions of Ramirez's employment or have "subvert[ed] [her] ability to function in the workplace." *Alfano*, 294 F.3d at 373, 380. Indeed, Ramirez notes in her complaint that she "spent most of her time . . . working on one large project: the "Temin #MeToo Index" ("more than forty [hours] per week"), and does not allege that the menial tasks made up the bulk of her work or prevented her from completing her research and analysis for the Index. Doc. 1 ¶ 244, 328. Beyond this, throughout her employment, Ramirez was the firm's "most-junior employee,"

16

and, as Defendants argue, her cleaning duties were explicitly set out in the office manual and were commensurate with her Research Assistant role.  Doc. 52 at 7; Doc. 1, ¶¶ 132-138.

However, even assuming that Ramirez sufficiently alleged an abusive working environment, beyond conclusory allegations that Defendants relied on "racial stereotypes, including stereotypes about Black or Brown women, as being subordinate, less capable, and suited for menial tasks like cleaning," Doc. 1, ¶¶ 450-451, Ramirez has not pleaded sufficient facts to support her claim that she was subjected to an abusive working environment because of her race.  *See Lucio v. N.Y.C. Dep't of Educ.*, 575 F.App'x 3, 5 (2d Cir. 2014) (holding that, even at the pleading stage, the complaint must plead facts that "would allow a court to draw a reasonable inference that [the plaintiff] was subjected to any mistreatment or adverse action *because* of her [protected class]"); *Brown v. Henderson*, 257 F.3d 246, 252 (2d Cir. 2001) (it is "axiomatic" that the mistreatment is only actionable when it occurs because of an employee's protected characteristic).  Here, Ramirez worked as an intern and then as a Research Assistant at the Firm; she dedicated most of her work hours to a substantive research project—the Index— and in addition was instructed to run errands and complete cleaning tasks.  These responsibilities are consistent with those listed in the Firm's office manual and with Ramirez's junior status at the Firm.  Ramirez has not sufficiently alleged facts to show that the assignment of these tasks and the criticism and disciplining she experienced are linked to racial animus.  As such, Ramirez's claim that Defendants took adverse action against her by subjecting her to a hostile work environment fails.

### 3.   Constructive Discharge

Third, Ramirez argues that Defendants took adverse action against her by constructively discharging her.  A constructive discharge may constitute an adverse employment action "when

the employer, rather than acting directly, deliberately makes an employee's working conditions

so intolerable that the employee is forced into an involuntary resignation." *Morris v. Schroder

Capital Mgmt. Int'l*, 481 F.3d 86, 88 (2d Cir. 2007) (internal quotation marks omitted).

"Working conditions are intolerable if they are so difficult or unpleasant that a reasonable person

in the employee's shoes would have felt compelled to resign." *Whidbee v. Garzarelli Food

Specialties, Inc.*, 223 F.3d 62, 73 (2d Cir. 2000).

Here, in support of her constructive discharge claim, Ramirez alleges that (1) she

resigned after her work on the Index "became very difficult," (2) Temin instructed Ramirez to

tidy the office and work on the Index as a means of pushing her to quit, and (3) the Firm

"removed [her] from the #MeToo Index project, leaving [her] with no meaningful intellectual

work." Doc. 1 ¶¶ 314, 346; Doc. 51 at 16.  In particular, Ramirez alleges that in the fall of 2019,

the "constant exposure to stories of sexual assault" began to affect her health, and, when she was

assigned to conduct research for an upcoming sexual harassment training, she was given

"extensive edits late at night" and was subjected to "micro-critiquing."  Doc. 1 ¶¶ 314, 329, 342,

348.  On September 20, 2019, Ramirez was removed from the project, and she resigned later that

day.  *Id.*  Though Ramirez suggests in her opposition that she was removed from working on the

Index entirely and was as a result left without any "meaningful intellectual work," her complaint

alleges only that she was removed from a specific project (research and preparation for a

harassment training).

Ramirez's dissatisfaction with her work assignments (both the menial tasks and the

Index) is insufficient to establish a constructive discharge claim.  *See Stetson v. NYNEX Service

Co.*, 995 F.2d 355, 360 (2d Cir. 1993); *DeSalvo v. Volhard*, 312 F.App'x. 394, 397 (2d Cir.

2009) (affirming District Court's finding that plaintiff's "dissatisfaction with work assignments"

did not support her constructive discharge theory).  Beyond this, "hypercritical supervision" and excessive monitoring and criticism also are insufficient to support a claim for constructive discharge.  *Stetson*, 995 F.2d at 360; *Chertkova v. Connecticut Gen. Life Ins. Co.*, 82 F. 3d 81, 90 (2d Cir. 1996).

Further, while courts have found that a drastic change in employment status or responsibilities can amount to a constructive discharge, changes in assignments or responsibilities that do not "radical[ly] change" the nature of work are not typically adverse employment actions.  *See Galabya*, 202 F. 3d at 641 (quoting *Rodriguez v. Bd. of Ed.*, 620 F. 2d 362, 366 (2d Cir. 1980)).  While Ramirez alleges she was removed from one short-term project, she was not removed from the Index as a whole; this reduction in responsibilities is not a drastic change.

Ramirez also alleges that "Temin expressly stated that she intended to get Ramirez to quit."  Doc. 51 at 16.  In particular, Ramirez alleges that Temin "aim[ed] to force Ramirez to quit by not giving her promotions or raises, hiring people above her, and 'paying her so little it's criminal.'"  Doc. 1, ¶ 352.  In her complaint, Ramirez notes Temin shared these plans with another employee, Beilin Ye, but does not specify how she learned of the conversation.  Here, Ramirez fails to provide sufficient factual allegations that Temin intended to constructively discharge her.  *Gilford v. NYS Off. of Mental Health*, No. 17 Civ. 8033 (JPO), 2019 WL 1113306, at 6 (S.D.N.Y. Mar. 11, 2019) ("No matter what the pleading standard is, [a] complaint must at least contain enough factual allegations that are *not* made upon information and belief to 'raise a right to relief above the speculative level.'" (quoting *Twombly*, 550 U.S. at 555)).

Because all three of Ramirez's adverse employment action arguments—disparate pay, hostile work environment, and constructive discharge[2]—fail, Ramirez cannot satisfy the third element of the *McDonnell* framework and, as such, cannot establish a *prima facie* case of discrimination under § 1981.  Therefore, Ramirez's discrimination claims under § 1981 are dismissed without prejudice.

## 2.   Retaliation

Ramirez alleges Defendants retaliated against her for her participation in a protected activity.  Specifically, Ramirez alleges she engaged in protected activities by "speaking out against Temin's racist comments about the right kind of diversity . . .".  Doc. 1, ¶ 455.  To state a claim for retaliation, a plaintiff must establish (1) participation in a protected activity; (2) defendant's knowledge of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action.  *Dickens v. Hudson Sheraton Corp., LLC*, 167 F. Supp. 3d 499, 522 (S.D.N.Y. 2016), *aff'd*, 689 F.App'x 670 (2d Cir. 2017).

"A protected activity is one that 'protest[s] or oppose[s] statutorily prohibited discrimination.'" *Kouakou v. Fideliscare New York*, 920 F. Supp. 2d 391, 400 (quoting *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 566); *Brands-Kousaros v. Banco Di Napoli S.P.A.*, No. 97 Civ.

---

[2] In her complaint, Ramirez puts forth other factual allegations that might support a claim of adverse employment action; however, in her opposition, she focuses only on disparate pay, hostile work environment, and constructive discharge, and is silent on any remaining allegations.  Numerous courts have held that a plaintiff's failure to address an issue in its opposition raised by its adversary amounts to a concession or waiver of the argument.  *See, e.g., AT&T Corp. v. Syniverse Techs., Inc.*, No. 12 Civ. 1812 (NRB), 2014 WL 4412392, at *7 (S.D.N.Y. Sept. 8, 2014) (holding that the plaintiff's failure to address an issue in its opposition brief "concedes the point"); *W. Bulk Carriers KS v. Centauri Shipping Ltd.*, No. 11 Civ. 5952 (RJS), 2013 WL 1385212, at *3 (S.D.N.Y. Mar. 11, 2013) (holding that plaintiff conceded issue of subject matter jurisdiction by failing to address it in its opposition brief); *In re UBS AG Sec. Litig.*, No. 07 Civ. 11225 (RJS), 2012 WL 4471265, at *11 (S.D.N.Y. Sept. 28, 2012) (holding that plaintiff conceded issue through silence in opposition brief), *aff'd sub nom. City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173 (2d Cir. 2014).  As such, the Court considers only those adverse action arguments raised in her opposition.

1673 (DLC), 1997 WL 790748, at *5 (S.D.N.Y. Dec. 23, 1997) ("the protected activity alleged must involve some sort of complaint about a type of discrimination that [a statute] forbids.").

While a protected activity generally involves the filing of a formal complaint of discrimination with an administrative agency, *see Kotcher v. Rosa & Sullivan Appliance Ctr.*, 957 F.2d 59, 65 (2d Cir. 1992), "both formal and informal complaints [are] protected activity . . ." *Schaper v. Bronx Lebanon Hosp. Ctr.*, 408 F. Supp. 3d 379, 391 (S.D.N.Y. 2019) (citing *Hubbard v. Total Commc'ns, Inc.*, 347 F. App'x 679, 680–81 (2d Cir. 2009)); *Soliman v. Deutsche Bank AG*, No. 03 Civ. 104 (CBM), 2004 WL 1124689, at *12 (S.D.N.Y. May 20, 2004) ("Although a plaintiff does not have to lodge a formal complaint to an administrative body in order to have engaged in a protected activity, . . . doing so is the most obvious example of a protected complaint.") (internal citations omitted).

Protected complaints generally include "making complaints to management, writing critical letters to customers, protesting against discrimination by industry or by society in general, and expressing support of co-workers who have filed formal charges." *Soliman*, 2004 WL 1124689, at *12 (citing *Cruz*, 202 F.3d at 566); *see also Sumner v. U.S. Postal Serv.*, 899 F.2d 203, 209 (2d Cir. 1990).   An informal complaint may be "nothing more than a simple 'objection voiced to the employer,' . . . but at the very least, 'there must be some form of professional indicia of a complaint made against an unlawful activity.'"  *Soliman*, 2004 WL 1124689, at *12 (internal citations omitted); *Moran v. Fashion Institute of Technology,* No. 00 Civ. 1257 (KMW), 2002 WL 31288272, at *8 (S.D.N.Y. Oct. 7, 2002) (telling one's supervisor to "stay away" and "leave him alone" did not constitute a protected activity), citing *Cruz,* 202 F.3d at 566 (slapping one's harasser, even assuming that it was done in response to unlawful harassment, was not a protected activity).

21

To constitute a protected activity, an informal complaint must be sufficiently specific to make it clear that the employee is complaining about statutorily prohibited conduct.  *See, e.g.*, *Thomas v. iStar Fin.*, 438 F. Supp. 2d 348, 365 (S.D.N.Y. 2006) ("[C]omplaints centered on general allegations of harassment unrelated to race [ ] are not protected activity under Title VII."); *Galdieri-Ambrosini v. Nat'l Realty & Development Corp.*, 136 F.3d 276, 292 (2d Cir. 1998) ("Implicit in the requirement that the employer have been aware if the protected activity is the requirement that it understood, or could reasonably have understood, that the plaintiff's opposition was directed at conduct prohibited by [statute]."); *Krasner v. HSH Nordbank AG*, 680 F. Supp. 2d 502, 520 (S.D.N.Y. 2010) ("The law protects employees [who] . . . make[] informal protests of discrimination, including making complaints to management, so long as the employee has a good faith, reasonable belief that the underlying challenged actions of the employer violated the law.") (citations omitted).

Where a plaintiff's complaint is "vague or ambiguous and does not sufficiently articulate the nature of harassment, courts hold that a plaintiff has not engaged in a protected activity." *Soliman*, 2004 WL 1124689, at *13; *Sales v. YM & YMHA of Washington Heights and Inglewood*, Nos. 00 Civ. 8641 (RLC) and 01 Civ. 1796 (RLC), 2003 WL 164276, at *8 (S.D.N.Y. Jan. 22, 2003) (because plaintiff failed to explain to the defendant employer the racially derogatory meaning behind the ambiguous term used by his supervisor, the defendant employer cannot be found to have been aware of plaintiff's protected activity); *West v. Mt. Sinai Medical Center,* No. 00 Civ. 6191 (CBM), 2002 WL 530984, at *3-4 (S.D.N.Y. Apr. 9, 2002) (because plaintiff did not specify that there was anything sexual about her alleged harasser's conduct, no reasonable factfinder could conclude that the defendant employer understood that her complaint implicated Title VII); *Moran,* 2002 WL 31288272 at *8 (plaintiff never stated he

objected to his supervisor's conduct on the grounds of sexual harassment);  *Lapsley v. Columbia University-College of Physicians,* 999 F. Supp. 506, 525 (S.D.N.Y.1998) (plaintiff complained about the employer's discriminatory promotion practices but did not articulate the basis for her belief of discrimination).

Here, the only protected activity Ramirez alleges in support of her § 1981 retaliation claim was when, during a conversation on Washington Heights and the musical "In the Heights," where Temin suggested that "the right kind of diversity" included more white people, Ramirez suggested that an increased white presence in Washington Heights is "most likely due to gentrification."  Doc. 1 ¶ 175.

Ramirez argues that she need not have explicitly identified the particular discrimination or used "magic words" to afford her complaints protected-activity status.  Doc. 51 at 26. Ramirez is correct that "there are no magic words that must be used when complaining about a supervisor," *Ramos v. City of New York*, No. 96 Civ. 3787 (DLC), 1997 WL 410493, at *3 (S.D.N.Y. July 22, 1997), and she need not have explicitly used the word "discrimination" to afford her comments protected-activity status, *see Int'l Healthcare Exch., Inc. v. Global Healthcare Exch., LLC,* 470 F.Supp.2d 345, 357 (S.D.N.Y. 2007).  However, when the conduct complained of does not lend itself to a reasonable inference of unlawful discrimination, the use of more explicit language by the employee may be the "only way to put the employer on notice that the employee believes himself to be complaining of discriminatory conduct."  *Krasner*, 680 F. Supp. 2d at 521-22; *Ramos*, 1997 WL 410493, at *3 ("in order to be protected activity the complainant must put the employer on notice that the complainant believes that discrimination is occurring.").  In other words, ambiguous complaints that do not make the employer aware of alleged discriminatory misconduct do not constitute protected activity.  *See Sales*, 2003 WL

164276, at *8 (finding complaints to an employer unaware of the racial undertones of term used
by employee's supervisor were not protected activity).

Ramirez's comment about "gentrification" simply does not rise to the level of protected
activity; Ramirez's comment was not an informal complaint or protest, nor did it put Temin on
notice that Ramirez was complaining of discriminatory conduct.  *See Soliman,* 2004 WL
1124689, at *13 ("Because [the defendant] would not have understood that [the plaintiff's
comments] had anything to do with . . . harassment, [any] subsequent retaliation cannot, as a
matter of law, amount to an unlawful retaliation under Title VII.").  As Ramirez cannot allege a
protected activity, her retaliation claim under § 1981 fails and is dismissed without prejudice.

### B.  New York State Human Rights Law Claims

#### 1.  *Discrimination: Race, Color, and National Origin*

Ramirez brings several claims under the New York State Human Rights Law
("NYSHRL").  First, Ramirez alleges that, in violation of N.Y. Exec. Law § 290 *et seq.*,
Defendants discriminated against her based on her race, color, and national origin.  Ramirez
alleges the same facts in support of each claim, and these are the same facts alleged to support
Ramirez's § 1981 claim.

NYSHRL claims regarding discrimination are analyzed identically to § 1981
discrimination claims.  *See Vivenzio v. City of Syracuse*, 611 F.3d 98, 106 (2d Cir. 2010); *Brown
v. City of Syracuse*, 673 F.3d 141, 150 (2d Cir. 2012) (holding that courts analyze Title VII, §
1981, and NYSHRL discrimination claims under the burden-shifting framework set forth in
*McDonnell Douglas Corp. v. Green*).  As Ramirez fails to establish a case of race-based

discrimination under § 1981, her NYSHRL claims related to discrimination based on race, color, and national origin are dismissed without prejudice.

### 2.  *Discrimination: Sex*

Second, Ramirez alleges that, in violation of N.Y. Exec. Law § 290 *et seq.*, Defendants discriminated against her based on her sex.  As with her discrimination claims under § 1981, Ramirez's sex discrimination claim under the NYSHRL is analyzed under the three-step burden-shifting framework set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See Pucino*, 618 F.3d at 117 n.2.  Under the *McDonnell* framework, a plaintiff first must establish a *prima facie* case of discrimination.  *McDonnell*, 411 U.S. at 802.  To establish a *prima facie* case of discrimination under the NYSHRL, a plaintiff must show that (1) she belonged to a protected class, (2) she was qualified for the position, (3) she suffered an adverse employment action, and (4) the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent.  *See Terry*, 336 F.3d at 137-38.  Although a plaintiff is not required to plead facts proving each element of a *prima facie* case of discrimination at the pleading stage, her allegations must provide "plausible support" for a "minimal inference" that the employer was motivated by discriminatory intent."  *Littlejohn*, 795 F.3d at 311.  Further, those allegations must be "fact-specific."  *See Grimes*, 785 F. Supp. 2d at 296.  Conclusory or naked allegations will not do. *See id.*

As stated above, Ramirez satisfies the first two elements:  she is an Afro-Latina woman, and Defendants do not dispute that she was qualified for her position.  Here again, however, as with her race-based discrimination claim, Ramirez's sex-based discrimination claim fails upon reaching the third element:  Ramirez fails to properly allege an adverse employment action.

In the instant case, Ramirez alleges Defendants took adverse action against her by disciplining her, subjecting her to a hostile work environment, and constructively terminating her employment.  Doc. 1, ¶ 407.  Ramirez further alleges these actions "reflect gender stereotypes, including stereotypes about Black or Brown women as being subordinate, less capable, and suited for menial tasks like cleaning."  *Id*. ¶ 409.  Ramirez also alleges Defendants "subjected [her] to stereotyped gender expectations and punished [her] for not conforming" to those stereotypes.  *Id.*

Here, in support of her sex discrimination claim, Ramirez alleges the same adverse employment actions as those she alleged in support of her race discrimination claims.  As Ramirez could not plausibly allege that she suffered an adverse employment action in her § 1981 race-based claim, she cannot, in reliance on the same facts, satisfy that element here.  As such, Ramirez cannot establish a *prima facie* case of discrimination based on her sex, and her sex discrimination claims under the NYSHRL are dismissed without prejudice.

### 3.  *Discrimination: Disability*

Third, Ramirez alleges that, in violation of N.Y. Exec. Law § 290 *et seq.*, Defendants discriminated against her based on her disabilities, including her post-traumatic stress disorder ("PTSD"), attention-deficit/hyperactivity disorder ("ADHD"),[3] gynecological symptoms consistent with endometriosis, allergies, leg injury, and migraines.  In particular, Ramirez alleges Defendants harassed her because of her disabilities, and in certain instances failed to provide reasonable accommodations for her disabilities.

### 1.  Reasonable Accommodation

---

[3] Ramirez does not allege any facts related to her ADHD.

The NYSHRL makes it unlawful for any employer to fail to provide reasonable accommodations for known disabilities of their employees.  N.Y. Exec. Law § 296(3)(a).  This rule is subject to the exception that employers are not required to provide accommodations that would subject the employer to undue hardship.  *Id*. § 296(3)(b).  In order to make out a *prima facie* case of failure to accommodate, the plaintiff must show that (1) she was disabled as defined by the statutes; (2) her employers had notice of the disability; (3) with reasonable accommodation, she could perform the essential functions of her job, and (4) the defendants refused to make reasonable accommodations of her needs.  *See Parker v. Columbia Pictures Indus.*, 204 F.3d 326, 332, 332 n.1 (2d Cir. 2000).

Defendants do not contest that Ramirez was disabled.  However, Defendants argue Ramirez did not request a reasonable accommodation for her disabilities, and, "to the extent [she] [did] request[] an accommodation," Defendants argue, they provided it.  Doc. 34 at 19.

Ramirez makes several allegations related to her disabilities.  First, she alleges she was denied a request to work from home after undergoing laparoscopic surgery for possible endometriosis.  Doc. 1 ¶¶ 199-202.  Ramirez underwent the procedure on January 11, 2018.  *Id.* ¶ 199.  Her surgeon told her she "would need at least a full week off work," and told her to "work from home" if she "could not take that much time off."  *Id.* ¶ 200.  Rather than ask for the time off, Ramirez requested she be allowed to work from home for the week.  *Id.* ¶ 201.  Ramirez alleges Temin told her to "use [her] sick days for the home rest."  *Id.* ¶ 202.  In other words, Temin granted Ramirez a week off work, but denied Ramirez's request to work from home.

Aside from a broader definition of disability under state law, a plaintiff's "state law reasonable accommodation claim is 'governed by the same legal standards as federal ADA claims.'"  *Cody v. Cty. of Nassau*, 345 F.App'x 717, 719 (2d Cir. 2009) (quoting *Rodal v.*

*Anesthesia Grp. of Onondaga, P.C.*, 369 F.3d 113, 117 n.1 (2d Cir. 2004)).  Under state and federal law, "generally, it is the responsibility of the individual with a disability to inform the employer that an accommodation is needed."  *Costabile v. N.Y.C. Health & Hosps. Corp.*, 951 F.3d 77, 81 (2d Cir. 2020) (per curiam) (quotation omitted).  However, where the disability is obvious—that is, if the employer knew or reasonably should have known that the employee was disabled—then the employer must engage in "an interactive process with their employees and in that way work together to assess whether an employee's disability can be reasonably accommodated."  *Id*. (quoting *Brady v. Wal-mart Stores, Inc.*, 531 F. 3d 127, 135 (2d Cir. 2008)).

"Reasonable accommodation may take many forms, but it must be effective."  *Noll v. International Business Machines Corp.*, 787 F. 3d 89, 95 (2d Cir. 2015) (internal citations omitted).  At the same time, "employers are not required to provide a perfect accommodation or the very accommodation most strongly preferred by the employee.  *Noll*, 787 F.3d at 95 (citing 29 C.F.R. § 1630 app. ("[Although] the preference of the individual with a disability should be given primary consideration[,] ... the employer providing the accommodation has the ultimate discretion to choose between effective accommodations, and may choose the less expensive accommodation or the accommodation that is easier for it to provide.")).  "All that is required is effectiveness."  *Noll*, 787 F.3d at 95.

Here, Ramirez notified Temin of her need for a post-surgery accommodation, and Temin granted her an accommodation—allowing her a one-week leave to recover.  The accommodation granted was also effective:  Temin allowed Ramirez the amount of leave recommended by her surgeon.  Though this was not Ramirez's preferred accommodation—she requested to be able to work from home—it is an effective accommodation and, as such, is reasonable.

28

Second, Ramirez alleges she was denied a reasonable accommodation for her migraines. Doc. 1 ¶¶ 214-217.  Ramirez claims she told Temin that she suffered from migraines "on multiple occasions." *Id.* ¶ 214.  Ramirez alleges she would ask Temin for a break to get food, but Temin was "rarely sympathetic," and would instruct Ramirez to complete office tasks and errands.  *Id.*  On April 8, 2019, Ramirez turned off the lights as a way to manage her migraine and associated light sensitivity.  According to Ramirez, Temin instructed her to turn on the lights.  However, Ramirez notes she was able to "perform[] her job without the[s] accommodations," albeit "in pain."  Doc. 51 at 24.

Here, Ramirez does not allege that she was unable to perform her job due to her migraines, such that her employer would be required to provide her with a reasonable accommodation.  *See Dudley v. New York City Housing Authority*, No. 12 Civ. 2771 (PGG) 2014 WL 5003799, at *34 (S.D.N.Y., Sept. 30, 2014) ("Implicit in the [NYSHRL] is the requirement that the accommodation enable the employee to continue to enjoy or perform the terms, conditions or privileges of employment") (internal citations omitted); *Anderson v. National Grid, PLC*, 93 F. Supp. 3d. 120, 124 (E.D.N.Y. 2015) (granting summary judgment against employee who acknowledged that he was "performing all the essential functions of the job . . . without any accommodation," such that no "rational factfinder could conclude that plaintiff needed a reasonable accommodation"); *Johnson v. Maynard*, No. 01 Civ. 7393 (AKH), 2003 WL 548754, at *6 (S.D.N.Y. Feb. 25, 2003) (same).

Because Ramirez fails to establish that Defendants did not provide a reasonable accommodation for her possible endometriosis or for her migraines, her reasonable accommodation claims under the NYSHRL are dismissed without prejudice.

2.  Termination

29

In addition to her reasonable accommodation claims, Ramirez alleges Temin "yelled at [her] for going to a doctor's appointment for a severe shellfish allergy." Doc. 51 at 24. Ramirez attempts to connect this conduct to her eventual "termination," claiming "(1) [she] suffers from a disability [under the NYSHRL], and (2) that the disability caused the behavior for which [she] was terminated." *Id.* at 23 (citing *Anyan v. New York Life Ins. Co.*, 192 F. Supp. 2d 228, 245 (S.D.N.Y. 2002), *aff'd sub nom. Anyan v. Nelson*, 68 F. App'x 260 (2d Cir. 2003). Specifically, Ramirez argues "[o]ne can reasonably infer that Defendants did not feel that Ramirez was useful as an employee if her disabilities kept her from performing her [work]." *Id.* at 24. But Ramirez does not specify how the alleged disability at issue, a severe shellfish allergy, "caused the behavior for which [she] was terminated." Beyond this, as discussed above, Ramirez was neither terminated nor constructively discharged. Defendants argue "no facts establish deliberate and intolerable disability animus led to Plaintiff's resignation," Doc. 34 at 10, and the Court agrees. Ramirez's remaining discrimination claims under NYSHRL are dismissed without prejudice.

### 4. Retaliation

Fourth, Ramirez alleges that, in violation of N.Y. Exec. Law § 290 *et seq.*, Defendants retaliated against her for her participation in protected activity. Retaliation claims brought pursuant to the NYSHRL, like those brought pursuant to § 1981, are also analyzed under the *McDonnell Douglas* burden-shifting framework. *See, e.g., Borski v. Staten Island Rapid Transit,* 413 F.App'x. 409, 410 (2d Cir. 2011) ("We analyze both federal and state law retaliation claims under the familiar burden-shifting approach of *McDonnell Douglas Corp. v. Green."*); *Stavis v. GFK Holding, Inc.,* 769 F. Supp. 2d 330, 339 (S.D.N.Y. 2011) ("Retaliation claims arising under the NYSHRL and the NYCHRL are also analyzed using the *McDonnell Douglas* framework.").

To state a claim for retaliation under the NYSHRL, as under § 1981, a plaintiff must establish (1) participation in a protected activity; (2) defendant's knowledge of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action. *Dickens*, 167 F. Supp. 3d at 522, *aff'd*, 689 F.App'x 670 (2d Cir. 2017).

In support of her NYSHRL claim, Ramirez alleges she engaged in protected activities by "speaking out against Temin's racist comments about the right kind of diversity . . .", "stating that she needed to put her health first" and "request[ing] accommodations" for her migraines and PTSD and "request[ing] time off" after surgery, "report[ing] assault after Temin hit her," and "refus[ing]" to "fudge data" at Temin's request. Doc. 1 ¶ 400, Doc. 51 at 27. As stated above, Ramirez's comment about diversity and gentrification does not constitute a protected activity.

A protected activity is one that "protest[s] or oppose[s] statutorily prohibited discrimination." *Kouakou*, 920 F. Supp. 2d at 400 (citations omitted). While a protected activity generally involves the filing of a formal complaint of discrimination with an administrative agency, *see Kotcher*, 957 F.2d at 65, "both formal and informal complaints [are] protected activity . . ." *Schaper*, 408 F. Supp. 3d at 391 (citations omitted).

First, Ramirez's general statement about "put[ting] her health first" is not sufficiently specific to constitute a protected activity. *Soliman*, 2004 WL 1124689, at *13 (where a plaintiff's complaint is "vague or ambiguous and does not sufficiently articulate the nature of harassment, courts hold that a plaintiff has not engaged in a protected activity."); *Int'l Healthcare Exch., Inc. v. Glob. Healthcare Exch.*, LLC, 470 F. Supp. 2d 345, 357 (S.D.N.Y. 2007) ("ambiguous complaints that do not make the employer aware of alleged discriminatory misconduct do not constitute protected activity.").

Second, Ramirez's refusal to "fudge data" also does not constitute a protected activity. Ramirez alleges Temin asked her to "estimate" or "fudge" certain statistics related to sexual harassment in preparation for a training for a client; Ramirez refused.  Doc. 1 ¶¶ 329-334. Ramirez does not allege that she refused to "fudge" the statistics as a way to protest or otherwise oppose unlawful discrimination, and does not specify what, if any, discriminatory conduct Temin engaged in when she asked Ramirez to "fudge" data.  *See Ramos*, 1997 WL 410493, at *3 ("in order to be protected activity the complainant must put the employer on notice that the complainant believes that discrimination is occurring"; *Soliman*, 2004 WL 1124689, at *12 (an informal complaint may be "nothing more than a simple 'objection voiced to the employer,' . . . but at the very least, 'there must be some form of professional indicia of a complaint made against an unlawful activity.'") (internal citations omitted).

Third, Ramirez alleges she engaged in a protected activity when, after Temin hit her hand while she was carrying hot coffee, she told Temin "That was not okay.  You hit me.  That is an assault."  Doc. 1 ¶ 301.  This does not amount to protected activity.  *See Krasner*, 680 F. Supp. 2d at 521 (accusing employer of bullying and mistreatment not a protected activity); *Moran,* 2002 WL 31288272, at *8 (telling one's supervisor to "stay away" and "leave him alone" did not constitute a protected activity), *Soliman*, 2004 WL 1124689, at *13 ("telling employer to stay out of his personal life and pulling his arm away whenever [employer] touched him are not protected activities . . .").  Unfair treatment "is not actionable under the civil rights laws," and accusations of unfair treatment "do[] not constitute protected activity." *Ramos*, 1997 WL 410493, at *3; *see also Blanc v. Sagem Morpho, Inc.*, No. 07 Civ. 3085 (NGG), 2009 WL 1813236, at *13 (E.D.N.Y. June 25, 2009) ("an employee's complaint to an employer about unfair treatment in general is insufficient to constitute protected activity"); *Aspilaire v. Wyeth*

*Pharm., Inc.*, 612 F. Supp. 2d 289, 309 (S.D.N.Y. 2009).  "To be actionable, the unfair treatment must be due to one's membership in a protected class and the complaint must make that point sufficiently clear."  *Ramos*, 1997 WL 410493, at *3.  As Ramirez does not allege that the coffee incident was related in any way to discrimination on the basis of Ramirez's membership in a protected class, she fails to allege protected activity here.

Finally, Ramirez alleges she engaged in protected activity when she requested accommodations for her disabilities.  Specifically, Ramirez alleges she requested time off after undergoing surgery, requested a break from working on the Index after experiencing symptoms related to her PTSD, and requested that she be able to work with the lights off while experiencing migraines.  While requests for reasonable accommodations can be protected activities, *Farmer v. Shake Shack Enterprises, LLC*, 473 F. Supp. 3d 309, 331 (S.D.N.Y. July 21, 2020), Ramirez's claim fails upon reaching the third and fourth elements required for a retaliation claim:  Ramirez fails to allege (3) an adverse employment action related by (4) causal connection to her alleged protected activities.  *Dickens*, 167 F. Supp. 3d at 522, *aff'd*, 689 F. App'x 670 (2d Cir. 2017).  As stated above, Ramirez is unable to state a claim for failure to provide a reasonable accommodation, and fails to allege an adverse employment action related to any of her stated disabilities.  As such, her retaliation claims related to her alleged disabilities fail and are dismissed without prejudice.

### C.  New York City Human Rights Law Claims

Ramirez brings several claims under the New York City Human Rights Law ("NYCHRL").  While with respect to certain claims, NYCHRL claims are reviewed "independently from and more liberally than their federal and state counterparts," *LaSalle v. City of New York*, No. 13 Civ. 5109 (PAC), 2015 WL 1442376 at *3 (S.D.N.Y. Mar. 30, 2015),

NYCHRL retaliation claims are analyzed under the same standards as those brought under § 1981 and the NYSHRL. *See, e.g., Borski v. Staten Island Rapid Transit,* No. 09 Civ. 4916, 413 Fed. Appx. 409, 410 (2d Cir. 2011) ("We analyze both federal and state law retaliation claims under the familiar burden-shifting approach of *McDonnell Douglas Corp. v. Green."); Stavis,* 769 F. Supp. at 339 (S.D.N.Y. 2011) ("Retaliation claims arising under the NYSHRL and the NYCHRL are also analyzed using the *McDonnell Douglas* framework."). As such, Ramirez's retaliation claim under the NYCHRL is dismissed without prejudice.

In addition to the retaliation claim, Ramirez alleges that, in violation of  N.Y. Admin. Code § 8-107 *et seq.*, Defendants discriminated against her on the basis of her race, color, and national origin, sex, and disabilities.  NYCHRL claims are reviewed more liberally than those brought under § 1981 and the NYSHRL, *LaSalle*, 2015 WL 1442376 at *3.  This means that a complaint may fail to state a claim under federal and state statutes, but still be allowed to proceed under the NYCHRL.  However, a complaint alleging a NYCHRL claim must still allege facts on the basis of which a court can find differential treatment. *Id.* at *5-6 (citations omitted).  Courts must be mindful that the NYCHRL is not a general civility code; the plaintiff still bears the burden of showing that the conduct is caused by a discriminatory motive, *i.e.*, because of the protected characteristic. *See Soloviev v. Goldstein*, 104 F. Supp. 3d 232, 247 (E.D.N.Y, May 13, 2015).  Still, unlike the NYSHRL, "the NYCHRL does not require either materially adverse employment actions or severe and pervasive conduct." *Mihalik*, 715 F.3d at 114.  A showing that "the plaintiff was treated less well because of a discriminatory intent" would suffice. *Workneh v. Super Shuttle Int'l, Inc.*, 15 Civ. 3521 (ER), 2016 WL 5793744, at *9 (S.D.N.Y. Sep. 30, 2016) (quoting *LaSalle*, 2015 WL 1442376, at *2).

34

Defendants argue that Ramirez failed to plead facts giving rise to an inference of discrimination "based on any protected characteristic."  Doc. 52 at 4.  "An inference of discrimination can arise from circumstances including, but not limited to, 'the employer's criticism of the plaintiff's performance in ethnically degrading terms; or its invidious comments about others in the employee's protected group . . .'".  *Littlejohn*, 795 F.3d at 312 (quoting *Leibowitz v. Cornell Univ.*, 584 F.3d 487, 502 (2d Cir. 2009)).

Here, Ramirez alleges that Temin suggested she and other women who were red nail polish are unintelligent and unsophisticated, told Ramirez that she sounded "angry" while on the phone and that her hoop earrings and "bold" lipstick were unprofessional, and complained to Ramirez that "dreadlocks" were unprofessional.  Doc. 1 ¶¶ 149-155, 161-162, 183, 180, 187.  Ramirez argues that Temin, in making these comments, relied on racial and gendered stereotypes, including "stereotypes about Black or Brown women as being subordinate" and "less capable . . .".  Doc. 1 ¶¶ 187, 368, 374.  Ramirez further alleges Temin made offensive comments about other people of color, including Congresswoman Alexandria Ocasio-Cortez and Valerie Smith, President of Swarthmore College.  *Id.* ¶¶ 191, 192.

These allegations are sufficient to create an inference of discrimination based on race, color, national origin, and sex.  *See Windsor v. Rockefeller Ctr/Tishman Speyer*, No. 01 Civ. 4374 (SAS), 2002 WL 1467834, at *4 (S.D.N.Y. July 8, 2002) (employer's "possibly stereotypical comments," including instructing Black employee not to wear his pants hanging below his waist, were sufficient to create inference of race discrimination); *Colbert v. FSA Store, Inc.*, 19 Civ. 9828 (LJL), 2020 WL 1989404, at *4-5 (S.D.N.Y. Apr. 27, 2020) (finding inference of discrimination where employer "made a number of comments that can be plausibly construed to reflect racial stereotyping or constitute coded racial comments . . ."); *LaSalle*, 2015 WL

1442376, at *5 ("even a 'single comment that objectifies women . . . made in circumstances where that comment would, for example, signal views about the role of women in the workplace [may] be actionable'" under the NYCHRL) (internal citations omitted).

As to her claim under the NYCHRL that Defendants discriminated against her on the basis of her disabilities, Ramirez alleges that Defendants failed to provide reasonable accommodations for her disabilities and "made numerous disparaging comments about [her] disabilities." Doc. 1 ¶ 395. Like the NYSHRL, the NYCHRL makes it unlawful, among other things, for any employer to fail to provide reasonable accommodations for known disabilities of their employees. N.Y. Admin. Code § 8-107(15)(a). As with the NYSHRL, in order to make out a *prima facie* case of failure to accommodate, the plaintiff must show that (1) she was disabled as defined by the statute, (2) her employers had notice of the disability, (3) with reasonable accommodation, she could perform the essential functions of her job, and (4) the defendants refused to make reasonable accommodations for her needs. *See Parker v. Columbia Pictures Indus.*, 204 F.3d 326, 332, 332 n.1 (2d Cir. 2000).

The NYCHRL provides broader protections than the NYSHRL, as it defines a "reasonable accommodation" to be "such accommodation that *can* be made that shall not cause undue hardship in the conduct of the [employer's] business. The [employer] shall have the burden of proving undue hardship." N.Y. Admin. Code § 8-102(18) (emphasis added). In other words, under the NYCHRL, "there are no accommodations that may be 'unreasonable' if they do not cause undue hardship." *Phillips v. City of New York,* 66 A.D.3d 170, 182 N.Y.S.2d 369, 378 (1st Dep't 2009), *cited with approval, Romanello,* 22 N.Y.3d at 884, 976 N.Y.S.2d 426, 998 N.E.2d 1050. And "there is no accommodation . . . that is categorically excluded from the universe of reasonable accommodation." *Id.* at 182. Under the NYCHRL, an accommodation

36

request is presumptively reasonable, and the burden is on the employer to rebut this

presumption.  *See Jacobsen v. N.Y.C. Health & Hosps. Corp.*, 11 N.E.3d 159, 167 (N.Y.

2014) ("[T]he City HRL places the burden on the employer to show the unavailability of any

safe and reasonable accommodation and to show that any proposed accommodation would place

an undue hardship on its business.").

      As discussed above, Defendants do not contest that Ramirez was disabled.  However,

Defendants argue Ramirez did not request a reasonable accommodation for her disabilities, and

to the extent she did request an accommodation, Defendants argue they provided it.  Doc. 34 at

19.  Ramirez alleges she was denied a reasonable accommodation following surgery for possible

endometriosis, and was also denied a reasonable accommodation for her migraines.  After the

surgery, Temin granted Ramirez a one-week leave to recover.  Though this was the

accommodation recommended by her surgeon, it was not Ramirez's requested accommodation:

she asked to be able to work from home.  As to her migraines, Ramirez requested that she be

allowed to take breaks and turn off the lights, and alleges Temin denied these accommodations.

Though, as explained above, neither allegation constitutes a failure to provide a reasonable

accommodation under the NYSHRL, both allege minimally sufficient facts to state a claim of

failure to accommodate under the NYCHRL.  Under the NYCHRL, Ramirez's requested

accommodations are presumed reasonable, and the burden falls on Defendants to demonstrate

that granting Ramirez these accommodations would cause an undue hardship.  Accordingly,

Defendants' motion to dismiss Ramirez's discrimination claims under the NYCHRL is denied.

### D.  Overtime Wages Claims

      Ramirez alleges Defendants, in violation of the New York Labor Law ("NYLL"), failed

to compensate Ramirez for all overtime work.  Specifically, Ramirez alleges she "consistently"

worked over forty hours a week, at times working between fifty and sixty hours per week. Sometimes, according to Ramirez, she worked upwards of eighty hours per week.  Doc. 1 ¶¶ 52, 79.

The pleading standard applicable to overtime claims under the NYLL is analytically identical to its federal counterpart, the Fair Labor Standards Act ("FLSA").  *See Amponin v. Olayan,* 14 Civ. 2008, 2015 WL 1190080, at *2 (S.D.N.Y. Mar. 16, 2015) (noting that "[t]he NYLL adopts [the FLSA] standard" and observing that the applicable "pleading standard—and the degree of specificity needed to state an overtime claim under the FLSA and NYLL—has been addressed by the Second Circuit" in a single series of cases).

The level of specificity required to state a cognizable claim for unpaid overtime was set out in *Lundy v. Catholic Health Sys. of Long Island, Inc.*, 711 F.3d 106 (2d Cir. 2013) and its progeny.  *See DeJesus v. HF Mgmt. Servs.,* 726 F.3d 85, 89-90 (2d Cir.2013); *Nakahata v. New York–Presbyterian Healthcare Sys., Inc.,* 723 F.3d 192, 200-01 (2d Cir.2013).  In particular, "[t]he Second Circuit announced . . .  that, 'to state a plausible [ ] overtime claim, a plaintiff must sufficiently allege 40 hours of work in a given workweek as well as some uncompensated time in excess of the 40 hours.'" *Burns v. Haven Manor Health Care Ctr., LLC,* 13 Civ. 5610, 2015 WL 1034881, at *2 (E.D.N.Y. Mar. 10, 2015) (quoting *Lundy,* 711 F.3d at 114).

In *DeJesus v. HF Management Services, LLC,* the plaintiff alleged that she worked "more than forty hours per week during 'some or all weeks' of her employment" and was not paid time-and-a-half for each hour in excess of forty hours. *DeJesus,* 726 F.3d at 87.  *DeJesus* held that these bare allegations amounted only to a recitation of the statutory language of the FLSA and were insufficient to state a claim.  *See id.* at 89.  *DeJesus* explained that *Lundy*'s requirement that

38

a plaintiff "allege overtime without compensation in a 'given' workweek was not an invitation to provide an all-purpose pleading template alleging overtime in 'some or all workweeks.'"  *Id.* at 90.  Rather, *DeJesus* explained, it was "designed to require plaintiffs to provide some factual context that will 'nudge' their claim 'from conceivable to plausible.'" *Id*. (quoting *Twombly*, 550 U.S. at 570).

"To satisfy this standard, plaintiffs are not required to keep careful records and plead their hours with mathematical precision, but they are required to draw on their memory and experience to provide complaints with 'sufficiently detailed factual allegations.'" *Bustillos v. Academy Bus, LLC*, No. 13 Civ. 565 (AJN), 2014 WL 116012, at *3 (S.D.N.Y. January 13, 2014) (rejecting pleadings of failure to pay overtime where employee alleged he "would regularly work from 60 to 90 hours a week").

Here, Ramirez fails to adequately plead a claim for failure to pay overtime wages.  Her allegations, that she consistently worked more than forty hours a week (at times fifty and sixty hours), are equivalent to those rejected in *DeJesus* and *Bustillos*; her complaint does not allege specific hours worked in any given week, but instead alleges only that she regularly worked over forty hours.  *See also Boutros v. JTC Painting & Decorating Corp.,* No. 12 Civ. 7576, 2013 U.S. Dist. LEXIS 148323, at *5–6, 2013 WL 5637659 (S.D.N.Y. Oct. 15, 2013) (noting that the court had required plaintiffs to identify at least one week in which they worked overtime hours but were not paid overtime); *Spiteri,* 12 Civ. 2780, 2013 U.S. Dist. LEXIS 128379, at *208–13, 2013 WL 4806960 (holding that the plaintiff's allegation that he "worked approximately fifty (50) to sixty (60) hours per week" was not sufficient); *Cromwell v. N.Y. City Health & Hosps. Corp.,* No. 12 Civ. 4251, 2013 U.S. Dist. LEXIS 69414, 5–13, 2013 WL 2099252 (S.D.N.Y. May 15, 2013) (despite allegations that the plaintiff "typically" worked five shifts per month,

with an extra shift "approximately twice a month" and other uncompensated time, it "did not

point to any particular workweek . . . during which [he] worked uncompensated time more than

40 hours"). Therefore, Ramirez's overtime wages claim is dismissed without prejudice.

### E.  Battery

Ramirez asserts a claim for battery under New York State law, alleging "Temin used her

hand to make bodily contact with Ramirez's hand as Ramirez was carrying hot coffee." Doc. 1 ¶

469. To maintain a cause of action for battery under New York law, a plaintiff must prove

"bodily contact, made with intent, and offensive in nature." *Salmon v. Blesser*, 802 F.3d 249,

256-57 (2d Cir. 2015) (quoting *North Shore Univ. Hosp.*, 129 A.D. 3d 937, 942-43 (2d Dep't

2015) (listing the elements of battery)). "The alleged contact 'must be one which would offend

the ordinary person . . . not unduly sensitive as to his personal dignity. It must, therefore, be a

contact which is unwarranted by social usages prevalent at the time and place at which it is

inflicted.'" *Cohen v. Davis*, 926 F. Supp. 399, 402 (S.D.N.Y. May 13, 1996) (citing Restatement

(Second) of Torts § 19, cmt. a; 2 N.Y. PJI 20 (Supp.1996)).

Here, whether the ordinary person would be offended if someone slapped her hand,

causing her to spill hot coffee, "is an issue of fact that cannot be decided on a motion to dismiss."

*Cohen*, 926 F. Supp. at 402 (denying motion to dismiss where plaintiff alleged defendant

grabbed her arm to prevent her from leaving the room). Thus, Defendants' motion to dismiss the

Ramirez's claim for battery is denied.

### F.  Intentional Infliction of Emotional Distress

Ramirez also asserts a claim for intentional infliction of emotional distress ("IIED")

under New York State law. To state a claim for IIED, a plaintiff must allege the following: "(1)

40

an extreme and outrageous act by the defendant, (2) intent by the defendant to inflict severe

emotional distress, (3) resulting in severe emotional distress, (4) and that the distress be caused

by the defendant's conduct." *Siben v. American Airlines, Inc.*, 913 F. Supp. 271, 279 (S.D.N.Y.

1996) (citation omitted).  "New York sets a high threshold for conduct that is 'extreme and

outrageous' enough to constitute intentional infliction of emotional distress." *Bender v. City of

New York*, 78 F.3d 787, 790 (2d Cir. 1996)*; see also Gay v. Carlson*, 60 F.3d 83, 89 (2d Cir.

1995) ("We have noted that New York courts have been 'very strict' in applying these

elements.") (quoting *Martin v. Citibank, N.A.*, 762 F.2d 212, 220 (2d Cir. 1985)); *TC v. Valley

Cent. Sch. Dist.*, 777 F. Supp. 2d 577, 604 (S.D.N.Y. 2011) (quoting *Howell*, 612 N.E. 2d at 702)

(the standard for asserting a claim is "rigorous, and difficult to satisfy"); *see also Conboy v. AT

& T Corp.*, 84 F. Supp. 2d 492, 507 (S.D.N.Y. 200), *aff'd*, 241 F. 3d 242 (2d Cir. 2001)

("Satisfying the first element of this claim is difficult, even at the pleadings stage").  To meet the

first requirement under New York law, a plaintiff must allege conduct that is "so outrageous in

character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be

regarded as atrocious, and utterly intolerable in a civilized society." *Martin v. Citibank, N.A.*, 762

F.2d 212, 220 (2d Cir. 1985) (quotation marks and citation omitted).

Here, Ramirez alleges Defendants engaged in "extreme and outrageous conduct" by

"creating a hostile work environment using abuse to force Ramirez to quit her employment,"

"hitting Ramirez and spilling coffee on her intentionally," and by "forcing Ramirez to work on a

project that increased her PTSD."  Doc. 1 ¶ 476.  Ramirez also alleges that Defendants "polic[ed]

[her] body," "forc[ed] her to clean when she was injured," and "pay[ed] her substandard wages

to force her to quit."  *Id.* ¶ 480.

Assuming these allegations are true, they do not rise to the level of extreme and outrageous conduct sufficient to support an IIED claim. *See, e.g.*, *Sigmon v. Parker Chapin Flattau & Klimpl*, 901 F. Supp. 667, 671-74 (S.D.N.Y. 1995) (intentional infliction of emotional distress claim dismissed where plaintiff suffered exclusion from firm activities, criticism, discrimination, and discriminatory comments, and received poor reviews); *Biberaj v. Pritchard Indus.*, 859 F. Supp. 2d 549, 557, 565 (S.D.N.Y. 2012) (supervisors' repeated direction of profanities at employee, including calling her a "[b]itch, slut, [and] whore," were insufficiently extreme and outrageous); *Elmowitz v. Exec. Towers at Lido*, LLC, 571 F. Supp. 2d 370, 379 (E.D.N.Y. 2008) (publicly shouting derogatory remarks and hitting plaintiff multiple times with a telephone was insufficiently extreme and outrageous). Thus, Ramirez's IIED claim is therefore dismissed without prejudice.

## IV.    CONCLUSION

For the reasons set forth above, the Defendants' motion to dismiss is GRANTED in part and DENIED in part.  The motion is granted as to Counts Six through Fifteen, and Seventeen. The motion is denied as to Counts One through Five, and Count Sixteen.  The parties are directed to appear for a telephonic conference on October 21, 2021 at 4:30p.m.  The parties are to dial (877) 411-9748 and enter access code 3029857# when prompted.

The Clerk of Court is respectfully directed to terminate the motion, Doc. 33.

It is SO ORDERED.

Dated:    September 24, 2021
          New York, New York

_____
EDGARDO RAMOS, U.S.D.J.